**STATE of Iowa, Appellee,**

v.

**Andrew Marcus SULLIVAN, Appellant.**

**No. 02–0542.**

Supreme Court of Iowa.

April 7, 2004.

---

Linda Del Gallo, State Appellate Defender, and Theresa R. Wilson, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney General, John P. Sarcone, County Attorney, and Bob DiBlasi, Assistant County Attorney, for appellee.

LAVORATO, Chief Justice.

Andrew Marcus Sullivan appealed his conviction and sentence for possession of marijuana with intent to deliver in violation of Iowa Code section 124.401(1)(*d*) (2001). Among other things, Sullivan contended the district court abused its discretion when it admitted evidence of a prior bad act. We transferred the case to the court of appeals, which reversed and remanded for a new trial. The State sought further review, which we granted. On further review, we affirm the court of appeals decision, reverse the district court judgment, and remand the case for a new trial.

## I. Background Facts and Proceedings.

On the morning of October 17, 2001, West Des Moines Police Officer Jeffrey Hartshorn received a telephone call from the manager of Hamlet Apartments in West Des Moines. The manager told the officer that a tenant had complained about an odor of marijuana in the hallway.

Officer Hartshorn and Officer Jason Bryan went to the apartment. When the officers arrived, they smelled the odor of burnt marijuana in the hallway as the manager had reported. They noted that the smell was stronger around the door to apartment twenty-six.

When the officers knocked on the door to the apartment, Sullivan responded. Sullivan told the officers there was only one other person in the apartment. He denied he was a tenant but said "Chris," who was inside the apartment, was a tenant. The officers asked to speak with Chris, and Sullivan gave them permission to enter the apartment for that purpose.

After entering the apartment, Officer Hartshorn followed Sullivan to the bedroom where Chris Greteman was located. Officer Bryan waited in the living room. Dawn Frink–McCall was also in the bedroom with Greteman. The two were the tenants listed on the lease for the apartment. Officer Hartshorn located another individual, Brian Fasbender, in another bedroom. Fasbender said he was living in the apartment and paying rent but had not signed the lease.

When Officer Hartshorn returned to the entry area of the apartment with the four individuals, Officer Bryan told him that he had seen items consistent with marijuana in the living room, some in a blue fish plate on an end table and some in a white Frisbee on the floor. There were also some Swisher Sweets cigar boxes on an end

table, some "blunts" (cigars whose contents have been emptied and refilled with marijuana), and a stack of money ($515) on the floor by the chair. At trial, Officer Hartshorn testified that the items found in the living room were consistent with use of marijuana but were not packaged for individual sale. Sullivan admitted to the officers that he was sleeping in the living room.

Greteman and Frink–McCall at first denied the officers permission to search the apartment. Officer Hartshorn then arrested all of the individuals for possession of marijuana and requested assistance from the narcotics unit.

When the narcotics unit arrived, Sullivan and Fasbender were transported to jail. Greteman and Frink–McCall agreed to talk to the narcotics detectives, and Greteman eventually consented to the search of the apartment.

The detectives found a baggie of nearly an ounce of marijuana in a freezer located in the kitchen. They also found a marijuana pipe and one pack of Zig Zag cigarette papers, commonly used to roll marijuana cigarettes. In the bedroom where Greteman and Frink–McCall were located, the detectives found crack cocaine in a cup on a closet shelf, plastic baggies, and an empty box of baggies. Plastic baggies were also found in the living room.

None of Sullivan's belongings were found in the bedroom shared by Greteman and Frink–McCall. And there was no evidence suggesting that Sullivan had been in the kitchen.

Don Simpson, narcotics detective with the City of Urbandale, testified that the baggie of marijuana found in the freezer and the crack cocaine found in the bedroom were not consistent with personal use. The detective also conceded the amount of marijuana could be consistent with personal use. Detective Simpson further testified that he believed the baggies were used for the packaging of illegal drugs although no drug substances were found in the baggies. In addition, the detective testified that in his experience people not only smoke the "blunts," but also sell them. Detective Logsdon testified that he believed the money found in the living room was proceeds from the sale of illegal drugs.

Eventually, Sullivan was charged and tried for possession of a controlled substance (marijuana) with intent to deliver, possession of a controlled substance (crack cocaine) with intent to deliver, and failure to possess a drug tax stamp for the crack cocaine. The State also sought a sentencing enhancement based on Sullivan's status as a second or subsequent offender.

The parties tried the case to a jury. During trial, the State offered the following testimony from Detective Simpson, which the court received over Sullivan's objections:

Q. Now, were you present when ... Detective Logsdon interviewed Andrew Sullivan? A. Yes, I was.

. . . .

Q. And what did Mr. Sullivan tell you about the marijuana? A. After he waived his *Miranda* rights he stated that he brought back an ounce of marijuana from Davenport.

Later, pursuant to Iowa Rule of Evidence 5.404(*b*), the State sought to offer testimony from Barbara Maness, Sullivan's attorney in a prior case of possession with intent to deliver, to establish Sullivan's knowledge and intent in the present case. The court allowed the testimony so long as it was limited to facts underlying the conviction and no mention of the criminal proceedings or attorney relationship was made. The court stated the evidence was not being offered to prove conformity of

conduct, rather it was offered to show Sullivan knew what he was doing. The court then admitted the following testimony from Maness over Sullivan's objection under rule 5.404(*b*):

Q. All right. And is it fair to say that during the course of your relationship with Mr. Sullivan he admitted to you possessing crack cocaine with intent to deliver? A. Yes, I heard him make those admissions.

Q. And was that back in 1998? A. Yes.

Q. Could you tell the jury what he said to you as far as his admission goes? A. I heard him say that he was in possession of crack cocaine, that his intent was to deliver it.

At the close of the State's case, the court granted Sullivan's motion for judgment of acquittal on possession of crack cocaine with intent to deliver and failure to possess a drug tax stamp for crack cocaine. The court denied the motion on possession of marijuana with intent to deliver. Sullivan did not offer any evidence and renewed his motion for judgment of acquittal, which the court denied.

The jury found Sullivan guilty of possession of marijuana with intent to deliver, and following sentencing, Sullivan appealed.

We transferred the case to the court of appeals, which reversed and remanded for a new trial. The court of appeals determined the district court abused its discretion when it admitted testimony from attorney Maness about Sullivan's 1998 admission that he possessed crack cocaine with intent to deliver it. We granted the State's application for further review.

## II. Prior Bad–Acts Evidence.

At issue here is the district court's admission of evidence that in the past Sulli-van possessed crack cocaine with the intent to deliver it.

The State contends such evidence was relevant to show Sullivan's intent to deliver marijuana and therefore admissible pursuant to Iowa Rule of Evidence 5.404(*b*). Additionally, the State contends the probative value of such evidence was not substantially outweighed by the danger of unfair prejudice.

Not surprisingly, Sullivan contends the evidence was not relevant to any issue at trial, and even if relevant, the probative value of such evidence was substantially outweighed by the danger of unfair prejudice.

**A. Applicable law.** Iowa Rule of Evidence 5.404(*b*) controls the admissibility of bad-acts evidence. It provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Iowa R. Evid. 5.404(*b*). Rule 5.404(*b*) codifies our common law on bad-acts evidence and is the counterpart to Federal Rule of Evidence 404(b).

For good reason, courts have long followed the rule against admitting bad-acts evidence to show "that the defendant has a criminal disposition in order to generate the inference that he committed the crime with which he is charged." *United States v. Myers*, 550 F.2d 1036, 1044 (5th Cir. 1977). As the court in *Myers* said, "A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is." *Id.* This concept is "fundamental to American juris-

prudence." *United States v. Foskey*, 636 F.2d 517, 523 (D.C.Cir.1980).

Courts have also recognized the critical importance of guarding against inroads on the rule, not because bad-acts evidence has no probative value, but for the very reason that such evidence may have very substantial value not recognized in law. *United States v. Goodwin*, 492 F.2d 1141, 1155 (5th Cir.1974). For this reason, the public policy for excluding bad-acts evidence "is founded not on a belief that the evidence is irrelevant, but rather on a fear that juries will tend to give it excessive weight, and on a fundamental sense that no one should be convicted of a crime based on his or her previous misdeeds." *United States v. Daniels*, 770 F.2d 1111, 1116 (D.C.Cir. 1985); *see also Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 218–19, 93 L.Ed. 168, 173–74 (1948).

Empirical studies have confirmed the courts' fear that juries treat bad-acts evidence as highly probative. *Daniels*, 770 F.2d at 1116; *see also* Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition*, 51 Ohio St. L.J. 575, 581–82 (1990) ("[T]he available psychological studies indicate that once they have characterized the accused's general character, the jurors are likely to attach great weight to that characterization in determining whether the accused acted 'in character' on the occasion of the charged offense.... Thus, having concluded that the accused is disposed to criminal misconduct, the jurors may ascribe great significance to that conclusion in deciding whether the accused committed the charged crime." (Footnotes omitted.)) [hereinafter "Imwinkelried"]. Notwithstanding the popular notion that character is a good indicator of a person's conduct on a given occasion, the empirical studies debunk this notion. Imwinkelried at 582. "Situational factors are often more determinant of human behavior," and "[t]he upshot is that the jurors may give character far more weight than it deserves." *Id.*

Bad-acts evidence diverts the jury's attention from the question of the defendant's responsibility for the crime charged to the improper use of the defendant's bad character. *United States v. Phillips*, 401 F.2d 301, 305 (7th Cir.1968). Consequently, even if the trial court gives a carefully crafted instruction limiting the significance of such evidence, prejudice to the defendant is "well-nigh inescapable." *United States v. Carter*, 482 F.2d 738, 740 (D.C.Cir.1973). Therefore the rule against bad-acts evidence is " 'just and wise' in order to avoid the enormous danger of prejudice to the defendant that [such evidence] creates...." *United States v. San Martin*, 505 F.2d 918, 921 (5th Cir.1974).

Like the above authorities, this court has recognized the danger of bad-acts evidence. We have characterized rule 5.404(*b*) as "an exclusionary rule vis-à-vis evidence of other crimes or wrongful acts." *State v. Barrett*, 401 N.W.2d 184, 187 (Iowa 1987). And this court has noted the types of prejudice our exclusionary rule seeks to avoid:

"(1) The over-strong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts; (2) The tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offenses; ... (3) The injustice of attacking one necessarily unprepared to demonstrate that the attacking evidence is fabricated...."

*State v. Cott*, 283 N.W.2d 324, 329–30 (Iowa 1979) (citation omitted). Finally, we have recognized that a specific exclusionary rule such as rule 5.404(*b*) is necessary

to exclude bad-acts evidence whose "only relevancy is to illustrate the character of the accused for purposes of establishing other actions in conformity with that character." *Barrett*, 401 N.W.2d at 187. Such a rule is necessary, we said,

> "not ... because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge."

*Id.* (quoting *Michelson*, 335 U.S. at 475–76, 69 S.Ct. at 218, 93 L.Ed. at 174 (footnote omitted in original)).

So it is not surprising that we have required the State to establish the following conditions before bad-acts evidence can be considered admissible: (1) the evidence must be relevant and material to a *legitimate* issue in the case other than a general propensity to commit wrongful acts, and (2) there must be clear proof the individual against whom the evidence is offered committed the bad act or crime. *State v. Roth*, 403 N.W.2d 762, 765 (Iowa 1987); *see also Barrett*, 401 N.W.2d at 187.

■ If the bad-acts evidence is relevant and material to some legitimate issue in dispute, then it is prima facie admissible. *State v. Mitchell*, 633 N.W.2d 295, 298 (Iowa 2001). Courts employ a two-step analysis to determine whether the bad-acts evidence is admissible. *Id.* First, the court must decide whether such evidence is relevant to a legitimate factual issue in dispute. *Id.* If the court determines the evidence is relevant to a legitimate factual issue in dispute, the court must then decide if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *Id.;* Iowa R. Evid. 5.403. An affirmative answer to the second question overcomes the evidence's prima facie admissibility, and

the court must exclude the evidence. *Mitchell*, 633 N.W.2d at 298–99.

■ **B. Analysis.** The challenged evidence here was that in 1998 Sullivan possessed crack cocaine with the intent to deliver it. The State contends the evidence was relevant to show Sullivan's intent to deliver marijuana. In support of its contention, the State argues that under rule 5.404(*b*), bad-acts evidence is relevant and material where there is a legitimate issue on the question of intent. *See* Iowa R. Evid. 5.404(*b*).

■ **1. Relevancy.** Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 5.401. "The test is 'whether a reasonable [person] might believe the probability of the truth of the consequential fact to be different if [such person] knew of the proffered evidence.'" *State v. Plaster*, 424 N.W.2d 226, 229 (Iowa 1988) (citation omitted) (first alteration in original). Evidence that is not relevant is not admissible. Iowa R. Evid. 5.402.

The State argues the consequential fact here is whether Sullivan possessed the nearly one ounce of marijuana found in the freezer with intent to deliver it.

The first sentence of rule 5.404(*b*)

provides for the exclusion of evidence of a defendant's other bad acts and crimes when that evidence is offered by the prosecution to prove that the defendant has a criminal disposition or a propensity for committing crime. The second sentence creates an exception for evidence offered not to prove character but some relevant issue in the case, such as intent, identity, lack of accident, motive or some other noncharacter issue.

Abraham P. Ordover, *Balancing the Presumption of Guilt and Innocence: Rules 404(b), 608(b) and 609(a)*, 38 Emory L.J. 135, 135 (1989) (footnote omitted) (discussing Federal Rule of Evidence 404(b)) [hereinafter "Ordover"].

According to one writer, there are "frontal assaults on the first prong of the uncharged misconduct doctrine, prohibiting the prosecutor from offering evidence of an accused's uncharged crimes on a character theory as circumstantial proof of conduct." Imwinkelried at 577. The frontal assault is the use of an accused's uncharged misconduct to prove the accused's mens rea. *Id.* at 578. Use of an accused's uncharged misconduct to prove the accused's mens rea is "already the most widely used basis for admitting uncharged misconduct evidence" and "threaten[s] to expand the admissibility of uncharged misconduct to establish mens rea to the point that this use of the evidence may substantially undermine the character evidence prohibition." *Id.* In short, one line of authority has gone so far as to advance "the proposition that the first sentence in rule 404(b) is automatically inapplicable whenever the prosecutor offers uncharged misconduct to support an ultimate inference of mental intent rather than physical conduct." *Id.* (discussing Federal Rule of Evidence 404(b)); *accord* Ordover at 159 ("For the most part, courts do not look to see if the material is propensity evidence. So long as it is offered to prove intent, such evidence passes muster under [Federal] Rule 404(b) and can only be excluded pursuant to Rule 403.").

The problem with this line of authority is that it

> requires the jury to draw an intermediate inference as to the accused's disposition or tendency to form a particular mens rea. The charged offense occurred at one time and place while the uncharged crime ordinarily occurs at a different time and place. To bridge the temporal and spatial gap between the two incidents, the prosecutor must assume the accused's propensity to entertain the same intent in similar situations. That assumption is the inescapable link between the charged and uncharged crimes. The trier of fact can reason from the starting point of the uncharged crime to a conclusion about the mens rea of the charged crime only through an intermediate assumption about the accused's character or propensity.

Imwinkelried at 583–84 (footnotes omitted).

Another writer likewise recognizes the danger of this line of authority:

> The issue is whether the government should be permitted to offer other crimes committed by or allegedly committed by the defendant as evidence of his intent to commit the specific crime now charged. Overwhelmingly, the courts do admit just this sort of evidence on the issue of intent. However, opinions in the hundreds of cases on this subject are less than satisfying. For the most part, they are composed simply of conclusory statements without any supporting analysis....
>
> It must be emphasized that we are not concerned with evidence of other crimes that are somehow connected to the crime charged in the indictment. Instead, we are dealing with a completely unconnected, but arguably similar, occurrence as probative of the intent to commit the specific crime now at issue.
>
> ... [E]vidence of an unconnected prior crime is always evidence of propensity and never evidence of a specific intent to commit the crime charged. Though an inference of general intent from the prior crime to the offense charged can be made, such an inference is based

upon propensity, which is precisely the reasoning that is condemned by the statute and its philosophical underpinnings. This bold contention has the support of a few courts, but essentially flies in the face of conventional judicial wisdom on the subject.

Ordover at 156–57 (footnotes omitted).

The writer continues:

[W]here the charge requires the prosecution prove a specific intent of the defendant to commit the specific crime charged, a prior unconnected similar act proves no more than a general intent. A general intent is propensity or character evidence, demonstrably different from evidence showing that the defendant had planned this crime on this day.

The conclusion that the defendant intended to commit this particular crime is the end product of a chain of inferences. It proceeds from the given proposition that the defendant at another place and time committed a crime similar to, but unconnected with, the present crime. From the proven fact—the "prior"—we are asked to infer that on a specific day and time this defendant had the specific intent to participate in the crime charged. The conclusion and its factual basis are widely separated. The gap can be bridged only by supplying an inference that the defendant has a tendency (that is, a propensity) to commit this kind of crime. It is this inference that is not permissible.

Ordover at 158; *see also* Julius Stone, *The Rule of Exclusion of Similar Fact Evidence: America,* 51 Harv. L.Rev. 988, 1032–33 (1938) (condemning this sort of reasoning as a perversion of the bad-acts evidence rule and stating that "[t]he broad rule, which seemed to give greater protection to the accused, has produced a rule depriving him of every shred of protection").

Notwithstanding this trend, several federal circuits have recognized that bad-acts evidence should be tested against the exclusionary first sentence of Federal Rule of Evidence 404(b). *See, e.g., United States v. Jenkins,* 7 F.3d 803, 806–07 (8th Cir.1994) (barring evidence of prior drug-dealing where charge was drug-dealing); *United States v. Cortijo–Diaz,* 875 F.2d 13, 15–16 (1st Cir.1989) (barring evidence of prior attempted robbery conviction where charge was assault); *United States v. Powell,* 587 F.2d 443, 448–49 (9th Cir. 1978) (barring use of prior conviction of possessing marijuana with intent to distribute where charge was possessing marijuana with intent to distribute it and conspiring to do the same); *Thompson v. United States,* 546 A.2d 414, 422–24 (D.C. 1988) (admitting evidence of defendant's prior drug-dealing to show intent held reversible error and stating that "[i]f proof of other crimes were admissible simply because intent must be shown, whether the defendant contests it or not, then such inherently prejudicial evidence would become routinely admissible . . . ."); *see also* 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5239, at 432 (Supp.1987) (stating that "the rule excludes evidence of other crimes in any case in which one of the inferences in the chain of circumstantial evidence is the inference from the act to the defendant's character or propensity to commit crimes").

Determining that the first sentence of rule 5.404(*b*) is automatically inapplicable whenever the prosecutor offers uncharged misconduct to support an ultimate inference of mental intent also creates a risk of prejudice to the accused:

[I]n attempting to decide at a conscious level whether the accused has a tendency to entertain a certain mens rea, the jurors may subconsciously conclude that

the accused is a repulsive, immoral individual—the type of person who should be incarcerated even if there is a reasonable doubt of his guilt of the charged offense. Finally . . . the jury can easily overestimate the probative value of the uncharged misconduct evidence.

Imwinkelried at 584 (footnotes omitted); *see also* Ordover at 135–36 ("Our ability to distinguish between the improper first-sentence purpose and the proper second-sentence purpose is frequently limited. The ability of a jury to use evidence admitted under the [Federal] Rule 404(b) exception for a proper purpose, at least in intent cases, is highly questionable. Moreover, the outcome of the trial will depend upon the procedure used in determining admissibility of the evidence, and upon the jury's ability to follow the instructions of the judge. What has this to do with important public policy? Everything. It is the difference between giving defendants a fair trial and not." (Footnotes omitted.)).

For these reasons, whenever the prosecutor offers uncharged misconduct to establish an ultimate inference of mens rea, the court should require the prosecutor to "articulate a tenable noncharacter theory of logical relevance." Imwinkelried at 585. And absent such an articulation, the court should not admit the uncharged misconduct. *Id.* at 584–85. There are some factual situations where the prosecutor can easily develop a valid, noncharacter theory of admissibility. *Id.* at 585 (giving an example); *see also* Ordover at 157 (giving examples).

Until recently, we had not followed the lead of those courts that ignore the first sentence of the bad-acts evidence rule whenever the State offers bad-acts evidence to support an inference of specific intent. Rather, we had treated our rule 5.404(*b*) as an exclusionary one as it was meant to be. *See, e.g., State v. Howell,* 290 N.W.2d 355, 360 (Iowa 1980) (in prosecution for possession of controlled substance with intent to deliver, rebuttal testimony about defendant's alleged prior drug sale was improper admission of prior crime); *State v. Deanda,* 218 N.W.2d 649, 651 (Iowa 1974) (evidence of subsequent marijuana sales by defendant was inadmissible in prosecution for delivery of a controlled substance); *State v. Mullen,* 216 N.W.2d 375, 377 (Iowa 1974) (in prosecution for delivery of marijuana, evidence of prior crimes of selling marijuana held inadmissible); *State v. Wright,* 191 N.W.2d 638, 639 (Iowa 1971) (admission of evidence showing that defendant, who was charged with stealing soybeans from farm, had participated in other soybean thefts in the neighborhood during several weeks preceding theft in question was reversible error).

We strayed from the exclusionary aspect of the rule in *State v. McDaniel,* 512 N.W.2d 305 (Iowa 1994). In that case, we held that evidence of an uncharged prior sale of marijuana was relevant to the intent issue in a prosecution for possession of marijuana with intent to deliver. *McDaniel,* 512 N.W.2d at 308–09. We approved the principle that "evidence of other illegal activities that tend to prove the [defendant's] general propensity to deliver illegal drugs is relevant and should be admitted." *Id.* at 308. We note this principle is the very thing that the proper application of the rule prohibits. This case ignored the first sentence of rule 5.404(*b*) and in effect turned the rule from one of exclusion to one of inclusion whenever bad-acts evidence is offered to prove specific intent. We think the better rule is that unless the prosecutor can articulate a valid, noncharacter theory of admissibility for admission of the bad-acts evidence, such evidence should not be admitted. Accordingly, we overrule *McDaniel.*

Here, the State offered a prior act of drug-dealing unconnected to the charge for which Sullivan was being tried without articulating a valid, noncharacter theory of logical relevance to support an ultimate inference of intent to deliver. Moreover, the temporal separation was three years, further casting doubt on the weight of this evidence. *See State v. Casady,* 491 N.W.2d 782, 785 (Iowa 1992) (remoteness of evidence affects its weight).

■ The State's inherent argument for admitting the evidence was based on the character theory that if Sullivan entertained the intent to deliver during a similar prior incident, he probably harbored the same intent at the time of the charged offense. The evidence was therefore not admissible and for that reason the district court abused its discretion in admitting it. *See Mercer v. Pittway Corp.,* 616 N.W.2d 602, 612 (Iowa 2000) ("We review a district court's decision concerning the admission of relevant evidence for an abuse of discretion."). Because we find the evidence was not admissible, we do not reach the second step of the analysis under rule 5.403, that is, whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant.

■ **2. Harmless error and Iowa Rule of Evidence 5.103(*a*).** Our conclusion that the district court improperly allowed the bad-acts evidence does not end our inquiry because "[n]ot all evidentiary errors require reversal...." *Shawhan v. Polk County,* 420 N.W.2d 808, 810 (Iowa 1988). Consistent with this statement, Iowa Rule of Evidence 5.103(*a*) provides in relevant part: "Error may not be predicated upon a ruling [that] admits or excludes evidence unless a substantial right of the party is affected...." Iowa R. Evid. 5.103(*a*).

Before enactment of rule 5.103(*a*), this court applied what is commonly referred to as a harmless error analysis. The court recognized there were two harmless error analyses, one where a constitutional error is alleged and another where a nonconstitutional error is alleged. *State v. Trudo,* 253 N.W.2d 101, 107 (Iowa 1977). Here, we are dealing with a claim of nonconstitutional error.

Where a nonconstitutional error was claimed, the test for determining whether the evidence was prejudicial and therefore required reversal was this: "Does it sufficiently appear that the rights of the complaining party have been injuriously affected by the error or that he has suffered a miscarriage of justice?" *Id.* In applying this test, the court presumed prejudice when error appeared unless the contrary was affirmatively established. *State v. Mattingly,* 220 N.W.2d 865, 869 (Iowa 1974); *accord Shawhan,* 420 N.W.2d at 810; *Lewis v. Kennison,* 278 N.W.2d 12, 15 (Iowa 1979). However, where the defendant conceded the challenged evidence or the same evidence was overwhelmingly clear in the record, any error in the admission of the challenged evidence was deemed not prejudicial. *Trudo,* 253 N.W.2d at 108.

Rule 5.103(*a*) neither changed the test nor its application. *See* Iowa R. Evid. 5.103 cmt. ("Subparagraph[ ](a) ... of Rule 103 [now 5.103] [is] identical to existing Iowa law.") (Second alteration in original.); *Shawhan,* 420 N.W.2d at 810. In further support of our conclusion that there has been no change in the test or its application, we view the language "a substantial right of the party is affected" in rule 5.103(*a*) as substantially similar to the language "the rights of the complaining party have been injuriously affected" in *Trudo,* 253 N.W.2d at 107.

The type of prejudice in our harmless error analysis differs from the rule 5.403 prejudice. As mentioned, rule 5.403 employs a balancing test, focusing on whether the prima facie admissibility of relevant evidence is overcome because the probative value of such evidence is substantially outweighed by the danger of unfair prejudice to the defendant. The outcome of that balancing determines the *admissibility* of the evidence. If we conclude the district court was incorrect in applying the balancing test, we simply hold the district court abused its discretion in admitting the evidence.

■ In contrast, in a harmless error analysis where a nonconstitutional error is claimed, under rule 5.103(*a*) we presume prejudice—that is, a substantial right of the defendant is affected—and *reverse* unless the record affirmatively establishes otherwise.

*Shawhan* is a good example of where we employed rules 5.403 and 5.103(*a*) in tandem. 420 N.W.2d at 809–10. We first concluded that the district court abused its discretion under rule 5.403 in admitting the challenged evidence because it was unfairly prejudicial. *Id.* at 810. However, under rule 5.103(*a*) we concluded the evidence did not affect the substantial rights of the plaintiffs and for that reason was not prejudicial requiring reversal. *Id.*

Here, the record does not affirmatively establish a lack of prejudice. To the contrary, the evidence affirmatively establishes prejudice.

When jurors hear that a defendant, on earlier occasions, has committed essentially the same bad acts for which the defendant is on trial, "the information unquestionably has a powerful and prejudicial impact." *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir.1994). And regardless of the stated purpose of such evidence, "the likelihood is very great that the jurors will use the evidence precisely for the purpose it may not be considered"—to convict the defendant because he or she is a bad person. *Id.; see also United States v. Daniels*, 770 F.2d 1111, 1118 (D.C.Cir.1985) (suggesting that "[t]o tell a jury to ignore the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities"); *United States v. Burkhart*, 458 F.2d 201, 204 (10th Cir. 1972) (suggesting that "once prior convictions are introduced the trial is, for all practical purposes, completed and the guilty outcome follows as a mere formality"); *State v. Daly*, 623 N.W.2d 799, 803 (Iowa 2001) (suggesting that admitting evidence of prior conviction for impeachment purposes, which were exactly the same crimes for which defendant was on trial, "could very likely have a substantial effect on a jury, which, although instructed not to do so, could reasonably be expected to misuse the evidence as substantive proof of guilt"); Ordover at 177 (stating empirical studies show that introducing defendant's criminal record increases likelihood of conviction).

In addition to the inherently prejudicial nature of the bad-acts evidence here, the properly admitted evidence was far from overwhelming that Sullivan possessed marijuana with intent to deliver.

Sullivan's admission was the only substantial evidence that the State had to connect him with the marijuana in the freezer. The problem with that admission is that it is ambiguous at best. Although Sullivan admitted he "brought back an ounce of marijuana from Davenport," that admission falls short of unequivocally tying that ounce of marijuana to the marijuana

in the freezer. The jury would have to make that dubious connection.

Moreover, an ounce of marijuana is a small amount of a controlled substance, usually associated with personal use rather than drug-dealing. On this point, Detective Simpson presented a close question: He testified that while the amount of marijuana found in the freezer was inconsistent with such use, such an amount could be consistent with personal use. In addition, well-recognized indicia of drug-dealing, such as measuring scales and customer lists with amounts, were not found on the premises and connected to Sullivan. *See State v. Scalise*, 660 N.W.2d 58, 62 (Iowa 2003). Given this state of the record, there was a likelihood that the jury would have concluded—absent the bad-acts evidence—the amount of marijuana was intended for personal use rather than for delivery.

Finally, despite the fact that $515 was found in the living room, there was no evidence the money belonged to Sullivan. In fact, there was testimony other parties claimed the money.

In sum, the State's case was not so overwhelming that the State would have prevailed even in the absence of the boost it received when the jury heard that Sullivan had dealt crack cocaine several years before.

### III. Disposition.

Because we conclude the district court abused its discretion in admitting Sullivan's prior act of possessing crack cocaine with intent to deliver and such admission was prejudicial, that is, it affected his substantial rights, we reverse the judgment of the district court and remand the case for a new trial.

**DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT**

**COURT JUDGMENT REVERSED AND CASE REMANDED FOR NEW TRIAL.**