## IN THE COURT OF APPEALS OF IOWA

No. 21-1456
Filed January 25, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MICHAEL ANTHONY HARPER,**
        Defendant-Appellant.

_____

Appeal from the Iowa District Court for Black Hawk County, Linda M. Fangman, Judge.

Michael Harper appeals from his convictions and sentences for possession of a firearm by a felon and first-degree harassment. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Bradley M. Bender, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Olivia D. Brooks, Assistant Attorney General, for appellee.

Considered by Schumacher, P.J., Ahlers, J., and Carr, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**CARR, Senior Judge.**

Michael Harper appeals from his convictions and sentences for possession of a firearm by a felon and first-degree harassment, contending there is insufficient evidence to sustain the convictions and the court abused its discretion in admitting certain evidence and in sentencing. Because there is substantial evidence to support the convictions and we discern no abuse of discretion in the court's evidentiary ruling or the sentence imposed, we affirm.

## I. Background Facts and Proceedings.

On April 17, 2021, at about 9:00 a.m., police were dispatched to 119 Argyle Street. The dispatch relayed that a man at the residence was threatening other relatives with violence and potentially had a weapon. Upon arrival, Officer Kristie Sommer and Officer Jason Chopard were approached by Connie Stewart and later joined by Lee Wooten, Harper's aunts.[1] Harper's grandmother, Verdella Wooten, was in the residence with Harper. Upon learning Harper was inside and making threats, possibly with a firearm, the officers requested additional backup to the scene and set up a perimeter around the house. Officer Chopard retrieved his rifle from his patrol car.

The officers eventually contacted both Verdella and Harper by phone and Harper agreed to come out of the house. Harper exited the house while speaking on the phone and with his other hand raised. According to Officer Ben Bloker, he "seemed very agitated as—when he was speaking, he was very loud, yelling, sweating profusely like he had been in a workout." Harper was taken into custody without incident and was searched; no handgun was found. Harper was placed in

---

[1] Because family members share last names, we will refer to them by first name.

the back seat of Officer Bloker's squad car, to be later transported to the police station, and read his *Miranda* rights. "He was still quite agitated. And as we were trying to gather information, he would try and speak to his relatives; but he was yelling while he was doing it." Officer Chopard also described Harper as "very verbal, very sweaty, agitated, upset."

Officer Bloker spoke with Harper, who asked to be transported to the hospital "because of his behavior and emotional state." Harper admitted being upset with this grandmother and yelling at her. Harper admitted saying "that if someone got in his face, he was going to knock them out." Harper then asked to speak to Lee.

Verdella told officers just she and Harper lived in the residence. She told them Harper said he was going to blow her brains out. Verdella gave the officers permission to enter the house and provided information about the layout of the house, noting she stayed on the ground floor and Harper stayed on the second floor. Officer Chopard stated he and another officer went upstairs "and looked to see if we could see a handgun or ammunition sitting around." It was not a thorough search. In a back room on the second floor there was a mattress and other items, including men's clothing, on the floor. Harper was then transported from the scene. The officers left the scene after informing the family members at the house that if they found anything, they should call.

Officers Chopard and Bloker returned to the residence about 10:00 a.m. They met with Connie, observed a Smith & Wesson 9mm firearm laying on the front porch and two magazines of ammunition, and were informed the firearm was found underneath the mattress in the back bedroom upstairs of the residence. The

officers were shown where the firearm was found. Connie reported the handgun was located underneath a mattress upstairs. Neither Connie, nor her husband, or Verdella gave any indication that they had any firearms located at that residence. Lee was no longer at the residence. The handgun was tested for fingerprints—none were found. The gun was operational.

Officer Bloker's squad car camera was recording while Harper was in the backseat before being transported. The recording captured a conversation Harper had with Lee at 9:33 a.m. when she came to the squad car. In hushed tones, Harper told Lee where the firearm was, and asked her to retrieve the gun and "clips." Harper told her that if the cops found the firearm his life would be over, his relatives would not see him again, and he would "go federal for ten years." He needed her to put the firearm in her purse and to not let the officers search the house. Harper said, "Look auntie, auntie. Look at me. Look at me. You don't even have to give it back. You can have it. . . . Auntie if they find it, it's over for me. Y'all not going to see me no more."

Harper was charged with being a felon in possession of a firearm and first-degree harassment. He stipulated he was a previously convicted felon.

At trial, Verdella testified she was eighty-seven years old on April 16, and her daughters Connie and Lee were visiting that weekend from Missouri. They were helping clean old furniture out of the house. She testified Harper lived on the second floor of the house. Verdella stated that on April 17, 2021, Harper "wasn't acting sane" and was swearing at her. Verdella said she had a bat and Harper "told me if I hit him with that bat he was going take that bat and beat the F'ing hell out of me." Verdella testified she did not remember telling the responding police

Harper said he "was going to blow [her] F'ing brains out." Verdella testified she called Connie and told her to come to the house and bring the police because Harper was acting strange and she didn't know what he was going to do. On cross-examination, Verdella said it had been five or six years since she had seen Harper with a gun and she was not aware if there was a gun in the house.

Connie testified her mother called her on April 17 and asked her to come to the house, call the police, and not to enter the house because Harper was "hysterically upset." Harper believed some court papers were thrown away the day before when they were cleaning the house. Connie testified she called 911, and she acknowledged that bodycam video shows she told responding police Verdella told her Harper "got up in her face and told her that he was gonna shoot her." But she testified she did not remember saying that; rather Harper threatened to tear up the house and beat her mother up. Connie acknowledged that on the 911 call, she reported her mother was afraid Harper would shoot them or kill them.

Connie also testified that when she and the others were cleaning the house on April 16, ammunition had been found on the second floor. She stated she did not bring a gun to the house. On April 17, after police left with Harper, Lee told Connie a gun had been found in the house and Connie called to report the gun to police. Lee placed the handgun on the porch floor. Connie stated she had never seen Harper with a firearm, had no reason to believe the handgun was his, and Harper did not reside in the house. But she acknowledged bodycam video indicates she told officers she didn't want Harper coming back in three weeks and shooting her mother.

Harper elected to testify. He denied living at Verdella's house and stated he stayed there only on occasion, kept some documents there, and had his mail delivered there. He testified he went to Verdella's on April 17 to get a social security card and birth certificate he needed for a new job he was starting in a few days and to help move furniture and clean the upstairs of the residence. Harper testified he looked all over the upstairs but there was "nothing in none of the rooms. Everything had been thrown outside in the dump except for a bed in the far back room." Harper stated he got upset and began to swear because he could not find his paperwork. He testified his grandmother "was holding a bat because when I was irate, I was cussing," which she does not allow in her house. He denied threatening to hurt her, stating he did say that if she hit him he would "break everything in this house."

Harper testified he called his mother and told her he was upset. His mother told him she had spoken to her sister and his things were in the back room. Harper stated that in searching the back room, he moved the bed and saw a firearm underneath the mattress: "I did not touch because I didn't know whose it was. I didn't want my fingerprints or my DNA on it." He stated the room was not the one where he normally slept. He explained that after he was taken into custody, he

> knew they were going to search, and I knew that I had c[o]me across
> that firearm when I was looking for my paperwork. And I didn't know
> whose it was. I didn't know if it was a cousin's or one of my friend's
> that I had over. So I—I never touched it because it didn't belong to
> me, and I didn't want—if anything came back or had something to do
> with it, I didn't want it to be pinned against me.

Harper stated he panicked and that is why he made the statements to his aunt.

The jury found Harper guilty of first-degree harassment and being a felon in possession of a firearm. The court sentenced Harper to concurrent prison terms.

Harper appeals, contending there is insufficient evidence to sustain the convictions and the court abused its discretion in admitting certain evidence and in sentencing. Additional facts will be incorporated when discussing the issues presented.

**II. Scope and Standards of Review.**

This court reviews sufficiency-of-the-evidence challenges for errors at law. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016).

> We will uphold a verdict if substantial record evidence supports it. Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt. Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence.

*State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (alteration in original)

We review evidentiary rulings for abuse of discretion. *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015). Likewise, "the decision of the district court to impose a particular sentence within the statutory limits is cloaked with a strong presumption in its favor, and will only be overturned for an abuse of discretion or the consideration of inappropriate matters." *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). "An abuse of discretion occurs 'when the district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Miller*, 841 N.W.2d 583, 586 (Iowa 2014) (citation omitted).

**III. Discussion.**

*Sufficiency of the evidence–felon in possession.* "The felon-in-possession statute requires proof that an adjudicated felon has a firearm 'knowingly . . . under the person's dominion and control or possession.'" *State v. Reed*, 875 N.W.2d 693, 708 (Iowa 2016). Harper asserts there is not sufficient evidence he knowingly possessed or exercised dominion and control over the firearm.

> "We have long held that 'dominion and control' may be shown by constructive, as well as actual, possession." The firearm enhancement statute, section 124.401(1)(e), requires proof that the defendant had "immediate possession or immediate control" of a firearm. This may be proved by showing [the defendant] had been "in such close proximity to the weapon as to claim immediate dominion over it" and that he had "knowledge of the presence of the firearm."

*Id.* (internal citations omitted).

Where, as here, the weapon is found in an area over which the defendant does not have exclusive control, knowledge of the presence of the weapon on the premises and the ability to maintain control over will not be inferred but must be established by proof.

> Such proof may consist either of evidence establishing actual knowledge by the accused, or evidence of incriminating statements or circumstances from which a jury might lawfully infer knowledge by the accused of the presence of the substances on the premises. In any event, the question of scienter or knowledge is one which must be resolved by the jury under the evidence in the case and upon proper instruction by the court embodying the principles discussed above.

*State v. Reeves*, 209 N.W.2d 18, 23 (Iowa 1973).

Here, there is no claim the jury was improperly instructed. We again note "[a] jury is free to believe or disbelieve any testimony as it chooses and to give as much weight to the evidence as, in its judgment, such evidence should receive."

*State v. Liggins*, 557 N.W.2d 263, 269 (Iowa 1996). Viewing in the light most favorable to State, we conclude there is ample evidence from which the jury could infer that Harper had knowledge of and control over the handgun.

Verdella told responding officers Harper threatened to shoot her, and Connie told officers she wanted the handgun out of the house so Harper would not use it to shoot Verdella. Their later lapses in memory about making those statements does not counter their acknowledgement of the video evidence.

Verdella testified Harper was the only person living on the second floor of the house, and Harper's mother told Harper his belongings had been taken to the back room. In the back room was a mattress and men's clothes and other items on the floor—raising a reasonable inference Harper was using the room. Verdella lived on the first floor and said no one else was staying with her other than Harper. Connie testified they had found ammunition on the second floor while moving items out to a dumpster. The jury heard Harper quietly tell Lee, "It is upstairs in the back room under the mattress. The gun is under the mattress in the back room. The far back room." They heard Harper tell Lee that if the cops found the firearm his life would be over, his relatives would not see him again, and he would "go federal for ten years." And he told her he needed her to "put the clips and shit in [her] purse" and to not let the officers find it. The jury heard Harper say, "Look auntie, auntie. Look at me. Look at me. You don't even have to give it back. You can have it." The gun was found under a mattress in the back room as Harper told Lee. In telling Lee she could keep the gun, the jury could infer it was Harper's to give. In addition, Harper testified he knew the handgun was under the mattress in the back room—the jury was not required to believe his explanation that he just

happened upon it. Connie testified Lee informed her she found a handgun and the police learned she found the gun under a mattress in the back room. Lee placed the handgun and two ammunition magazines on the front porch. While Harper argues the State's case is based on "suspicion, theory, and conjecture," we conclude substantial evidence was presented from which a jury could make reasonable inferences and find Harper "knowingly possessed or had under his dominion and control a firearm."

*Sufficiency of the evidence–harassment.* "A person commits harassment in the first degree when the person commits harassment involving a threat to commit a forcible felony . . . ." Iowa Code § 708.7(2)(a) (2021). The jury was instructed the State was required to prove:

> 1. On or about the 17th day of April, 2021, the defendant purposefully and without legitimate purpose had personal contact with another person as defined in Instruction 28.
> 2. The defendant had the specific intent to threaten, intimidate, or alarm that other person.
> 3. The defendant threatened to commit a forcible felony as defined in Instruction 29.

Harper asserts the evidence is insufficient to prove he had the specific intent to threaten his grandmother and that he threatened to commit a forcible felony.

*Specific intent.* "Harassment is a specific-intent crime, and intent is 'seldom capable of direct proof.' Intent may be inferred from the 'normal consequences of one's actions.'" *State v. Lacey*, 968 N.W.2d 792, 804–05 (Iowa 2021) (internal citation omitted).

Officers testified they responded to a call that a man "was threatening other relatives with violence" and there "possibly being a weapon involved, a gun

involved." At the scene, Harper's relatives reiterated "there was a possible firearm in the residence, and that he was making threats with the firearm."

At trial, Verdella testified she "might have" and "maybe" told the police Harper told her he was going to "blow [her] brains out; that he was going to shoot [her]." The jury viewed bodycam video and heard Verdella say Harper threatened to "blow her f'ing brains out." Verdella also testified Harper threatened to "beat the F'ing hell out of me" with a bat. While Harper testified he was yelling at his grandmother but did not intend to hurt her, the jury was not required to credit this denial and could reasonably conclude Harper had the specific intent to threaten, intimidate, or alarm his eighty-seven-year-old grandmother.

*Threatened to commit a forcible felony.* The *Lacey* court applied the ordinary meaning of the word "threat" in harassment cases: "a 'threat' means to 'promise punishment, reprisal, or other distress to' another." *Id.* at 804. Threats "need only 'be definite and understandable by a reasonable person of ordinary intelligence.'" *Id.* (citations omitted).

Instruction 29 informed the jury a "forcible felony" "means any felonious assault," which "includes an assault with intent to cause serious injury." It further defined "serious injury" as "a disabling mental illness, condition which cripples, incapacitates, weakens or destroys a person's normal mental functions, bodily injury which creates a substantial risk of death or which causes permanent disfigurement or extended loss or Impairment of the function of any bodily part or organ." There was substantial evidence from which the jury could find Harper's statements that he would blow his grandmother's brains out or beat her with a bat was a threat to commit murder or an assault with the intent to cause serious injury.

There is sufficient evidence to support each of the jury's verdicts.

*Evidentiary ruling.* During the State's cross-examination of Harper, the following occurred.

> Q. You heard [your grandmother's] testimony you were the only one living there on April 17, 2021? Isn't that correct? A. Yes. I was the only one living there, if that's what you want to say. I didn't live there on a consistent basis. I didn't sleep at my grandmother's house every night. There's times I stayed—I spent a month not staying there. There's times I spent weeks not staying there. And other people had stayed there while I was gone.
> Q. You said earlier under direct examination that you wanted to get out your prior criminal history. Specifically you called it possession of marijuana; correct? Your 2010 and your 2012 convictions; is that correct? A. Yeah. Possession of marijuana with intent.
> [Defense counsel:] Objection, Your Honor. That's over ten years old. He didn't disclose it.

After a sidebar, the court overruled the objection. Cross-examination continued:

> Q. You also have a 2010 conviction for attempted burglary in the third degree; correct? A. Yes.
> Q. And isn't it correct that you also have a 2014 conviction for a felony in Missouri; correct? A. Yes. That's the last time I was in trouble as far as—that's the last time that I was sent—locked up prior 'til now.

The court excused the jury and informed counsel its interpretation of Harper's statement was that he had not been in trouble since 2014.

The State requested it be allowed to ask Harper about pending charges against him that arose from a prior arrest at the same residence involved in the case at trial because Harper had opened the door for impeachment: "Obviously he said he had not been in trouble. Quite clearly he has and quite clearly it is an incident that shows that he was staying at that residence at that time. He lists that residence. He uses that residence, and this offense literally occurs at that residence."

Harper's trial counsel argued Harper "clarified his statement by saying he hadn't been convicted or been to prison on it. And I think that's a true statement based on—you know, I don't know it's an impeachable statement is my position."

The court observed:

> The statement by Mr. Harper was that he has not been in trouble since 2014. I do not want to start trying that other case. However, Mr. Harper doesn't have a license to just make whatever statement he wants and assume that no one can question him on that.
> I am going to let [the prosecutor] ask him if he has a prior charge from the month before regarding an incident at his grandmother's at that same residence. . . . I guess we'll have to hear from Mr. Harper, but that would not be my plan to go into that; just that there was another incident literally a month before at that same residence.

When the jury returned, the cross-examination continued:

> Q. Back on March 13, 2021, you were arrested for an assault and criminal mischief occurring at 119 Argyle; isn't that correct? A. Yes.
> Q. And that's your grandmother's residence that this incident occurs out of; correct? A. Yes.
> Q. And at that time you gave your address as 119 Argyle; correct? A. Yes.
> Q. And two days later on March 15, 2021, you also gave your address in the court paperwork in that case as 119 Argyle; isn't that correct? A. Yes.

On appeal, Harper contends the court erred in admitting the evidence of his March 21 arrest and the criminal-mischief charge. He argues he did not open the door—the court cut off his testimony where he attempted to clarify that he had not been convicted or been in prison since 2014. He asserts he was prejudiced because "[t]he overriding purpose and the result of the admission of the challenge evidence was to paint Harper as a bad person with a general propensity to commit wrongful acts."

The State urges this court to find error was not properly preserved because the defense did not object on the ground the testimony would be improper character evidence but rather improper impeachment. The State also asserts the court did not abuse its discretion in admitting the evidence because when a defendant misstates or attempts to minimize their criminal history, the State is allowed to impeach the defendant by asking about their criminal history.

It is evident from our review of the testimony the defense did not object on the basis of improper character evidence. Trial counsel advanced only that Harper's statement was not impeachable. We confine our review to that issue. The focus of the State's questions was directed at impeaching Harper's direct testimony that he did not live at his grandmother's house, his testimony that he wanted to be "upfront with the court" about his criminal history, and had not been in trouble since 2014. This was allowable impeachment.[2] *See State v. Parker*, 747 N.W.2d 196, 207 (Iowa 2008) ("Once Parker testified he had never been charged with burglary, the State was permitted to impeach Parker's assertion by asking him about his prior charge for burglary."). His arrest at his grandmother's house a month before the crimes charged cast doubt on his characterization he rarely stayed there and on his assertion he had been free from trouble since 2014. Although Harper walked back that assertion to some extent, we think the trial court acted within its discretion in allowing the questions.

---

[2] In a footnote the *Parker* court noted: "This type of impeachment requires a good faith basis for the inquiry and is limited to intrinsic evidence when the matter inquired into is collateral to the historical merits of the case; i.e., the cross-examiner cannot challenge the witness' answer with extrinsic evidence but is 'stuck' with it." 747 N.W.2d at 207 n.4.

Our conclusion about the trial court ruling is grounded in our deference to its discretionary nature. We think it wise to consider also whether prejudice accrued to Harper. When reviewing an evidentiary ruling on appeal, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Iowa R. Evid. 5.103(a). Thus, error in an evidentiary ruling that is harmless may not be a basis for relief on appeal. *See State v. Sullivan*, 679 N.W.2d 19, 29 (Iowa 2004). This court will presume prejudice under this approach, unless the contrary is affirmatively established. *Id.* When a nonconstitutional error is claimed, as in this case, the test is whether the rights of the objecting party have been "injuriously affected by the error" or whether the party has "suffered a miscarriage of justice." *Id.*

Harper elected to testify. His testimony included his previous criminal history including multiple felonies. Further, as we have detailed above, substantial evidence, most especially his direction to his aunt to secure, conceal and, at her option, keep the weapon, supports the verdict. Given this and his admissions on cross examination, we think Harper was not prejudiced by the admission of the March 13, 2021 arrest evidence.

*Sentencing.* At the sentencing hearing, the State recommended that the court impose consecutive prison sentences. The presentence investigation report also recommended prison sentences be imposed. Defense counsel argued for suspended sentences and probation. On the charge of possession of a firearm by a felon as a habitual offender, the district court ordered Harper serve an indeterminate term of imprisonment not to exceed fifteen years with a mandatory minimum sentence of three years and, on the first-degree harassment charge, the

court sentenced Harper to an indeterminate term not to exceed two years. The sentences were ordered to be served concurrently.

On appeal, Harper asserts probation would provide him the best opportunity for rehabilitation and the court abused its discretion in sentencing him to prison. We set out the court stated reasons for the sentence imposed:

> I'm looking at your past criminal history, the nature of this offense, your age, your education. I'm looking at the fact that you have not been successful on probation and you haven't been successful on parole. You've had your probation revoked. You've had parole revoked on two different occasions. You've absconded from probation. This is your third felony here in Iowa. You have a gun charge. You have drug charges. You have assaultive charges. And all of those things are concerning to the court.
> While I agree that what you're saying sounds good, I have to look at how you've behaved in the past. And right now, based on that behavior and based on the facts and circumstances of this particular case and based on your past assaults and the violent nature of those assaults, I do find that a prison sentence is appropriate.

The court's reasons are neither untenable or unreasonable. We affirm.

Because the sentences were clearly within statutory limits and thus cloaked with a "strong presumption in [their] favor" and the court considered no inappropriate matters, we discern no abuse of discretion. We affirm.

**AFFIRMED.**