# IN THE COURT OF APPEALS OF IOWA

No. 18-0764
Filed March 4, 2020

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ERIC DEWAYNE CAMPBELL Jr.,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Dubuque County, Thomas A. Bitter, Judge.

Eric Campbell Jr. appeals from his convictions for robbery in the first degree and voluntary manslaughter. **CONVICTIONS AFFIRMED; SENTENCE VACATED AND REMANDED FOR RESENTENCING.**

John C. Heinicke, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Thomas E. Bakke, Assistant Attorney General, for appellee.

Considered by Bower, C.J., and May and Greer, JJ.

**GREER, Judge.**

A jury found Eric Campbell Jr. guilty of robbery in the first degree and voluntary manslaughter. On appeal, Campbell maintains (1) there is insufficient evidence to support his convictions, (2) the court abused its discretion in admitting prior-bad-acts evidence, and (3) the court abused its discretion in sentencing him.

## I. Background Facts and Proceedings.

A little before 2:00 a.m. on April 2, 2016, three men, carrying guns and wearing bandanas partially covering their faces, broke into the home of Collin Brown and Alecea Lombardi in Key West, Iowa, just south of Dubuque, and demanded money and drugs. According to Lombardi, two of the men wore black bandanas and the third wore a white one, and two carried black guns and one carried "a silver-looking kind." Brown escaped from the home and ran to his neighbor's, shouting "Police, 911." One of the men shot Brown as he entered his neighbor's home. Brown died as a result of the wound. The three men fled the scene before police arrived.

Witnesses alleged Campbell was one of the men who broke into the home. He was charged by trial information with murder in the first degree and robbery in the first degree. After an initial mistrial, Campbell's second trial took place from February 27 through March 6, 2018. The jury convicted Campbell of the lesser-included offense of voluntary manslaughter and robbery in the first degree.

The court sentenced Campbell to a prison term not to exceed ten years for the voluntary-manslaughter conviction and a term not to exceed twenty-five years for the robbery conviction. The court ordered the two terms served consecutively. Campbell appeals.

## II. Analysis.

**A. Sufficiency of the Evidence.** Campbell contends there is insufficient evidence establishing he was the third man who broke into Brown's home, citing the State's lack of forensic evidence. He also asserts the court should not have permitted the jury to consider the accomplices' testimony establishing his participation in the crime because it lacked sufficient corroboration. Thus, without the accomplice testimony, the remaining evidence cannot generate a fact question about his participation in the crimes. *See* Iowa R. Crim. P. 2.21(3) ("A conviction cannot be had upon the testimony of an accomplice or a solicited person, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense.").

Campbell did not raise the specific issue of the alleged lack of corroboration for the accomplice testimony to the district court in his motion for judgment of acquittal. *See State v. Brubaker*, 805 N.W.2d 164,170 (Iowa 2011) ("To preserve error on a claim of insufficient evidence for appellate review in a criminal case, the defendant must make a motion for judgment of acquittal at trial that identifies the specific grounds raised on appeal." (citation omitted)). This issue has not been preserved for our review. *See State v. Bugely*, 562 N.W.2d 173, 176 (Iowa 1997) (noting,"The existence of corroborating evidence is a legal question for the court," and concluding that because corroborating evidence existed, "the trial court did not err in overruling [the defendant's] motion for judgment of acquittal"); *State v. Heidebrink*, 334 N.W.2d 344, 346 (Iowa Ct. App. 1983) ("Defendant contends that there was insufficient evidence to corroborate the testimony of the accomplice. . . . We agree with the State that defendant has failed to preserve error on these issues

by not challenging the sufficiency of the evidence at trial."), *overruled on other grounds by State v. Abbas*, 561 N.W.2d 72 (Iowa 1997).

Campbell did, however, challenge whether substantial evidence established his identity as one of the perpetrators of the crimes in his motion for judgment of acquittal. "We review challenges to the sufficiency of the evidence for correction of errors at law." *State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013). "The court views the evidence in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *State v. Keopasaeuth*, 645 N.W.2d 637, 640 (Iowa 2002). "[W]e will uphold a verdict if substantial record evidence supports it." *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (alteration in original) (citation omitted). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* "Circumstantial evidence is equally as probative as direct evidence." *Neiderbach*, 837 N.W.2d at 216.

No forensic evidence linked Campbell to the crime scene. None of the recovered DNA, fingerprints, or footprints were Campbell's. But strong circumstantial evidence established Campbell was the third man in the robbery. Corby Yager testified that she was with Campbell on the evening of April 1, 2016, when he told her he "needed to catch a stain."[1] Yager, who knew Brown to sell drugs, suggested Brown as a target to Campbell. Campbell then used Yager's

---

[1] According to Yager's testimony, "stain" is slang for robbery. *See also Stain*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=Stain (providing "[r]ob someone, usually for drugs," and "[t]o come up, rob someone," as the top two definitions for "stain").

phone—Campbell did not have one of his own—to call for a ride to "scope out Collin Brown's place." Yager rode with Campbell and two others to Brown's home. Yager directed the driver, Adriana Chica, to the location of Brown's home. Afterward, Yager left the group. Then, sometime between 2:00 a.m. and 3:00 a.m. on April 2, Campbell called her. Campbell asked Yager to come over. When she arrived at the apartment, Yager noted Campbell was "frantic . . . like, pacing back and forth between the kitchen and the main room." According to Yager, "[Campbell] said that everything went wrong, and I asked him what he meant, and he said, 'He got shot.' I'm like, 'Okay, what do you mean?' And he said, 'Tacari [Minifee] shot [Brown].'" Campbell told Yager he heard the gun go off three to five times and that he saw Brown fall but did not know if he was alive or dead.

Similarly, Adrianna Chica testified she was in the apartment with Campbell on April 1 when Campbell told Chica's boyfriend, Jeremy Dukes, that Campbell needed "to get a come-up quick." Chica understood this to mean Campbell wanted "to rob somebody, get the money out of them, get something out of them." Soon after, Chica and Dukes left the apartment. Later, Dukes received a phone call on Chica's phone,[2] and the couple drove back to the apartment. Campbell and Yager got in the car, and Chica drove the four of them by Brown's home. Chica understood she was "picking them up to show them where a potential stain was at" and realized Brown was the target. Chica and Dukes dropped Campbell back at the apartment and went to Wal-Mart. When Chica and Dukes arrived back at the apartment at around 1:20 a.m., they learned from Savanna Stotlar, Campbell's

---

[2] Dukes did not have his own phone.

girlfriend, that "[Campbell] and whoever he brought with him" could not remember which home was Brown's. To show them the house, Chica and Stotlar met the vehicle carrying the three men (and their driver) at McDonalds and led the car with the men back to Brown's house. Stotlar, who was driving the lead vehicle, used her brake lights to convey which home was Brown's when they drove past. The women then returned to the apartment, finding Dukes there when they arrived. Campbell and Minifee arrived at the apartment fifteen to thirty minutes later. According to Chica, Campbell "sounded panicked." A short while later, Chica "heard [Campbell] say that they fucked up, that it wasn't supposed to happen like that, and . . . then he said, 'Buddy might not make it.'"

Viewing the evidence in the light most favorable to the State, substantial evidence supports that Campbell participated in the crimes.

**B. Admission of Photo Exhibit.** Next Campbell maintains the trial court abused its discretion in admitting prior-bad-acts evidence. Campbell challenges admission of a photo police found on Minifee's phone of Campbell and another man. According to the metadata on the phone, the photo was taken in Dubuque on March 27, 2016, less than one week before the crimes. In the picture, Campbell is posing; the lower half of his face is covered with a black and white bandana and he is standing pointing two guns—one black and one silver—at the camera.

The State moved to admit the photo, noting Campbell, when originally interviewed by law enforcement, stated he did not know Minifee (among others) and had not been in Dubuque since sometime in 2013. And the State urged that the picture, when considered along with the testimony that three men entered the home with their faces covered with bandanas and with two black guns and one

silver gun, showed "motive and opportunity." Campbell asserted the State had other photographs that established Campbell was in Dubuque in the days and weeks before April 2 and had testimony of witnesses who established Campbell spent time with the people he later denied knowing. The court questioned whether the photo showed prior bad acts, noting "It's not evidence of a crime. It's not discussion of him committing a crime. It's a picture of someone holding guns with a bandana on their face, and the possession of a weapon is not a crime." The court, considering the proximity between the date of the picture and the date of the crime, found the photo relevant and "the prejudicial value . . . quite low." While Campbell asserted there was nothing in the State's case linking the guns or bandana in the photo to those worn by the three men, the court responded, "Well, those may be issues for the jury to decide. They're the deciders of fact, not all of us." The court admitted the evidence over Campbell's objection.

"We review evidentiary rulings regarding the admission of prior bad acts for abuse of discretion." *State v. Putman*, 848 N.W.2d 1, 7 (Iowa 2014). "Even if a trial court has abused its discretion, prejudice must be shown before we will reverse." *Id.*

The admission of prior-bad-acts evidence is governed by Iowa Rule of Evidence 5.404(b):

> (1) *Prohibited use.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> (2) *Permitted uses.* This evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

The rule "exclude[s] evidence that serves no purpose except to show that the defendant is a bad person, from which the jury is likely to infer he or she committed the crime in question." *State v. Rodriguez*, 636 N.W.2d 234, 239 (Iowa 2001). "[E]vidence which is relevant to prove some fact or element in issue other than the defendant's criminal disposition escapes the rule's prohibition." *State v. Cott*, 283 N.W.2d 324, 326 (Iowa 1979).

To be admissible, prior-bad-acts evidence (1) must be relevant to a legitimate, disputed factual issue, such as identity, intent, or motive; (2) supported by "clear proof the individual against whom the evidence is offered committed the bad act or crime"; and (3) its probative value must not be "substantially outweighed by the danger of unfair prejudice to the defendant." *See Putman*, 848 N.W.2d at 9–10 (quoting *State v. Sullivan*, 679 N.W.2d 19, 25 (Iowa 2004)).

The photo of Campbell with his face mostly covered and holding guns is neither a crime[3] nor an obvious "wrong." *See* Iowa R. Evid. 5.404(b)(1). While rule 5.404(b) also prevents "other acts" from being admitted to prove a person's character to show the person acted in accordance with the character, it is unclear to us what Campbell believes the photo establishes about his character. Gun ownership is not uncommon, and the photo itself does not show a criminal act by Campbell. Still, we will undertake the prior-bad-acts analysis outlined above.

---

[3] Campbell argues on appeal that the photo may depict going armed with a pistol, in violation of Iowa Code section 724.5(1). And we are aware, based on the presentence investigation report (PSI) available to the court at sentencing, that Campbell was previously convicted of a felony and recognize it is possible Campbell's possession of guns violated Iowa Code section 724.26, which makes it a crime for felons to possess firearms. But the jury was not informed of Campbell's previous conviction, and there was no indication made in court that the pictured activity may be illegal.

First, we must determine whether the photo is relevant. "Evidence is relevant if: (a) [i]t has any tendency to make a fact more or less probable than it would be without the evidence; and (b) [t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. We disagree with the State that the photo tends to show motive. *See Motive, Black's Law Dictionary* (11th ed. 2019) ("Something, esp. willful desire, that leads one to act."). But the fact that Campbell had, at a minimum, access to weapons that matched the description of two of the weapons used in the crimes less than one week later goes to opportunity and identity. *See, e.g., State v. Uthe*, 542 N.W.2d 810, 814 (Iowa 1996) (deciding evidence the defendant had a stolen checkbook in his possession two days after the last forged check was written from it "tended to prove [the defendant] had the opportunity to commit the crimes charged within the relevant time frame"); *State v. Knox*, 464 N.W.2d 445, 449 (Iowa 1990) (affirming the trial court ruling that the "defendant's prior possession of the alleged murder weapon" was admissible on the question of identity and opportunity because of the "highly probative" nature of the evidence). We acknowledge that the description of the guns carried by the three men was vague—two black guns and one silver gun—and that no one specifically linked the guns in the challenged photo to the crimes at issue. But, as the district court recognized, that goes to the weight the jury should assign to the evidence, not whether it is admissible.

Second, we must consider whether there is clear proof it is Campbell in the challenged photo holding the guns. *See Putman*, 848 N.W.2d at 9 ("There also 'must be clear proof the individual against whom the evidence is offered committed the bad act or crime.'" (citation omitted)). In his appellate brief, Campbell

characterizes the admitted photo as "a photograph of a man, purportedly Campbell." While we do not have Campbell sitting before us as the jury did when the photo was published to it, we note that the officer who recovered the photo from Minifee's phone testified without objection that it was Campbell in the photograph. Additionally, when challenging the admission of the photograph, Campbell did not address the issue of "clear proof" to the trial court. We do not consider this step of the analysis further.

Finally, we must consider whether the probative evidence of the photograph is substantially outweighed by the danger of unfair prejudice to Campbell. Because the specific guns in the photo were never linked to these crimes, the probative value of the photo is low. Similarly, while the State suggested the photo was important to show Campbell was in the Dubuque area in the days before the crimes and knew the other known participants in the crime, plenty of other evidence established these facts. And, even more importantly, whether Campbell was in Dubuque and knew the people involved in the crimes—something he originally denied to law enforcement—was not a contested issue at trial. *See* *Sullivan*, 679 N.W.2d at 25 (noting the court "must decide whether such evidence is relevant to a legitimate factual issue in dispute"). Even so, as the district court concluded, the danger of unfair prejudice from showing a photo of Campbell in which he not doing anything illegal and with which there is not a narrative or story about his character is minimal. We also find the State's evidence strong on the contested point, making any prejudicial effect of the challenged photograph minimal. *State v. Plain*, 898 N.W.2d 801, 815–16 (Iowa 2017). The district court did not abuse its discretion in admitting the challenged photo.

**C. Sentencing.** Campbell maintains the court considered improper factors when imposing sentence. The judge who presided over Campbell's second trial also presided over his initial trial that resulted in a mistrial and was involved, at least in some capacity, with the trials of Campbell's codefendants.[4] With that in mind, Campbell asserts the sentencing court improperly considered evidence from outside the record of this case in deciding to impose consecutive sentences.

"Review of sentencing decisions is for correction of errors at law." *State v. Letscher*, 888 N.W.2d 880, 883 (Iowa 2016). "We will not reverse the decision of the district court absent an abuse of discretion or some defect in the sentencing procedure." *Id.* (quoting *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002)).

Here, the State, Campbell, and the court recognized that the sentences for the voluntary-manslaughter and the first-degree-robbery convictions were mandatory; the court's discretion was whether to order Campbell to serve the sentences concurrently or consecutively. The court stated:

> The only real issue for the parties to argue today and for me to give some thought to is whether these sentences should run concurrent to each other or consecutive to each other, and I want to mention a

---

[4] The record before us establishes the same judge presided over both of Campbell's trials. Campbell asserts in his appellate brief that the judge also presided over the trials of his codefendants, but we do not have the record from the codefendants' trials and Campbell does not show how that fact is established in the record properly before us. *See* Iowa Rs. App. P. 6.801 (limiting the record on appeal to "[o]nly the original documents and exhibits filed in the district court case from which the appeal is taken, the transcript of proceedings, if any, and a certified copy of the related docket and court calendar entries prepared by the clerk of the district court"); 6.903(2)(g)(3) (requiring the appellant's brief to include "[a]n argument containing the appellant's contentions and the reasons for them with citations to the authorities relied on and references to the pertinent parts of the record . . . "). But at Campbell's sentencing hearing, the judge referenced having heard some of the evidence at the "other sentencings" and, in an apparent reference to the codefendants' trials, stated, "Of all the trials that I've had and all the evidence that I've seen and listened to . . . ."

few things that sort of occurred to me as I weigh that decision about consecutive versus concurrent.

I—I have every reason to believe, and I do believe, Mr. Campbell, that you did not intend for anyone to be shot or to be killed in this incident. Your attorney made reference to the fact that you of all people showed the most emotion about being bothered by what happened, according to the testimony, and I believe that testimony. I think that when this incident was over, the testimony was that you paced, that you were upset, that you were emotional, and I do think you were surprised by what happened. On the other hand, you were clearly the person that organized this whole event. You were the person who was told by someone not to bring Tacari out there because of his disposition, his personality. You were the one that got everybody together. You all put something on your faces, you all had weapons, and you all kicked the door in to somebody's residence. You were told that if that vehicle was there, that likely means Alecea and children would be there. You were one of the people involved in holding Collin Brown down and beating him physically, and your actions absolutely terrorized people that night. *And I've heard Alecea Lombardi speak both in her testimony and in her victim impact statements at other sentencings. I've listened to her voice on that 911 call, and it's hard to unhear that or to get that out of your head after you've heard it, especially so many times.* She was terrified. She was sobbing. She had her children with her, and that was a horrible experience, and I said before when I ruled on the motion for new trial that the evidence supported the findings by the jury and your conviction on these two counts, and it certainly did, *and it probably supported something more serious than what you were found guilty of, and to some extent, I consider you lucky, and you should probably consider yourself lucky with what the jury found in this case.*

You do not have a good criminal history at all. You've got a significant criminal history. I believe in the PSI it says that you've been to prison, I think, in the state of Illinois. It also makes reference to a felony conviction, I think, in Iowa. It talks about a domestic assault causing injury and impeding blood or airflow, what we call strangulation. So it's difficult to say for you that this was out of character because it certainly wasn't, and it was a calculated, planned and very, very dangerous and violent offense. Those are all the reasons why I cannot find enough good reason at all to run these concurrent. I think they have to be run consecutive to each other, and I think it's appropriate to run them consecutive.

I do also want to mention in the PSI, it was hard for me to read your version of what happened in this event. Your version to the drafter of the PSI essentially was it wasn't you, you weren't involved, you shouldn't have been charged, and if you were charged, you shouldn't have been convicted because you didn't do it, you're

innocent, and that was tough for me to read, and I don't buy that. *Of all the trials that I've had and all the evidence that I've seen and listened to, it was abundantly clear that you were there, you were the one that planned it and you were involved.* Again, I don't think anybody says you pulled the trigger, and I don't think anybody says that you intended for that to happen. Nevertheless, you played a huge role in this.

So I am going to run them consecutive to each other for all of the reasons that I've just indicated, including, but not limited to, your criminal history, the seriousness of this offense, and my consideration of the effect it had on the victims, the fact that this will promote deterrence in the community in general and the need to punish you and similar defendants for this type of action.

(Emphasis added).

We agree with Campbell that the court considered improper factors in imposing sentence. While Campbell was charged with murder in the first degree, his conviction was for voluntary manslaughter. The court cannot consider unproven offenses in sentencing a defendant. *State v. Sailer*, 587 N.W.2d 756, 762 (Iowa 1998) ("This rule prohibits a sentencing court from imposing 'a severe sentence for a lower crime on the ground that the accused actually committed a higher crime.'" (citation omitted)). The court's statement that the evidence "probably supported something more serious than what you were found guilty of" reveals the court's belief Campbell was guilty of a higher crime than his conviction. The court provided this as a reason it imposed consecutive sentences. Additionally, the court cannot rely on evidence it heard at the trials and sentencing hearings of Campbell's codefendants in deciding the appropriate sentence for Campbell. Campbell did not take part in those proceedings and could not either confront or control the evidence admitted. *Cf.* Iowa Code § 901.4 (giving the defendant, as the subject of the PSI, the opportunity to "file with the presentence investigation report, a denial or refutation of the allegations, or both, contained in

the report. The denial or refutation shall be included in the report"); *State v. Bentley*, 739 N.W.2d 296, 302 (Iowa 2007) ("[The defendant's] right to confront witnesses against him is an essential constitutional right, and we must be vigilant in guarding against its erosion."). Because the court considered improper factors in imposing sentence, we must remand for resentencing. *See State v. Carillo*, 597 N.W.2d 497, 501 (Iowa 1999).

### III. Disposition.

Because sufficient evidence supports his convictions and the trial court did not abuse its discretion in admitting a challenged photo, we affirm Campbell's convictions. However, the sentencing court relied on improper factors in imposing sentence, and we remand for resentencing.

**CONVICTIONS AFFIRMED; SENTENCE VACATED AND REMANDED FOR RESENTENCING.**