# IN THE COURT OF APPEALS OF IOWA

No. 21-1212
Filed December 21, 2022

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**TENKO JULIUS WILDE,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Joel Dalrymple, Judge.

A defendant appeals his convictions for continuous sexual abuse of a child, indecent contact with a child, and four counts of second-degree sexual abuse. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Stuart Hoover, East Dubuque, Illinois, for appellant.

Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.

Heard by Tabor, P.J., and Schumacher and Chicchelly, JJ.

**TABOR, Presiding Judge.**

Tenko Wilde challenges his six sex-offense convictions. Five counts involved his older son, K.O.; one was against his younger son, Z.O. In contesting the sufficiency of the evidence, Wilde highlights inconsistencies in the boys' testimonies about the times and places of the abuse. He also argues the district court erred in admitting bad-acts evidence in the form of two pornographic cartoons found on his phone. Finally, he claims prejudice from admission of a hearsay statement in which then three-year-old K.O. told family friends that Wilde performed a sex act on him.

First, viewing the evidence in the light most favorable to the district court's determinations of guilt and giving due deference to its credibility findings, we find substantial evidence that Wilde committed these crimes. Second, we find admission of the cartoons was improper but harmless. Third, we find admission of the hearsay was improper and prejudicial as to one count of second-degree sexual abuse. Thus, we affirm in part, reverse in part, and remand.

## I.      Facts and Prior Proceedings

Wilde and his partner, Emilea, had two sons: K.O., born in 2012, and Z.O., born in 2015. A few months after Z.O.'s birth, Emilea died. K.O. testified that sometime after his mother was gone, Wilde started sexually abusing him.

After his partner's death, Wilde's coworker, Heidi Schoellen, and her teenage son, Austin, helped the family. One day in the summer of 2015, the Schoellens were watching the boys while Wilde did chores around the house. The Schoellens noticed K.O. was often passing gas. While Heidi was out of the room, Austin urged K.O. to use the bathroom because he was still potty training.

According to Austin's testimony, K.O. said he couldn't use the bathroom because "his father had put his pee pee in his butt and it hurt." Shocked, Austin relayed K.O.'s statement to Heidi, who confronted Wilde. Wilde appeared confused and emotional; Heidi remembered him crying. Heidi later told a family friend about the incident. The friend contacted the Iowa Department of Human Services. In August 2015, the department and law enforcement began investigating. As part of their investigation, K.O. went to the child protection center for a forensic interview. But he did not disclose any abuse. So the department ruled the allegations unfounded.

Over the next few years, Wilde and his sons moved often. And Wilde held various jobs, including a stint as a truck driver in 2016 or 2017. During this time, K.O. remembered his father asking if he wanted to ride along for a delivery to the Minnesota State Fair. When K.O. said yes, Wilde told him he could only go if he performed sex acts on Wilde. K.O. did so.

Eventually, Wilde and the boys settled into a Cedar Falls trailer park, living at Lot 12. Wilde was active in online gaming and connected with a community of people who identified as "furries."[1] Through this online community, Wilde formed both platonic and romantic relationships with men from other states. He invited several men to come live with him and his sons at the trailer park. Among the first men to move in to the lot were Mason and Mateo.

---

[1] A "furry" is someone "especially interested in anthropomorphic or cartoon animals (e.g., Bugs Bunny)." Hsu, K.J. & Bailey, J.M., *The "Furry" Phenomenon: Characterizing Sexual Orientation, Sexual Motivation, and Erotic Target Identity Inversions in Male Furries*, 48 Arch Sex Behav 1349 (2019). Furries may take on personas as those animals. *Id.*

But that was not all that was happening at Lot 12. K.O. testified that Wilde routinely sexually abused him while they lived there. But as more men moved into the trailer, K.O. recalled that his father's clandestine sex acts against him became less frequent. Then Wilde bought Lot 41. Only he and his sons moved into that trailer—allowing Wilde's abuse to ramp back up to a "couple nights a week." K.O. testified that the sex acts continued during the summer of 2020, particularly in July, as he recalled hearing fireworks while enduring the abuse. K.O. also recounted a night when Wilde called both boys to his bedroom to perform sex acts. Z.O.'s testimony corroborated his brother's recollection.

Mason and the other men living with Wilde often took care of K.O. and Z.O. They babysat, cooked meals, and helped get them ready for school. In fact, it was Mason who K.O. eventually confided in. A few days before Labor Day 2020, Mason watched the boys while Wilde went out shopping. K.O. approached Mason while he was cooking dinner. In an emotional encounter, K.O. revealed he was upset about "something that his dad did." Mason thought Wilde possibly spanked or yelled at K.O. But K.O. said that was not the case and pointed to his rear, mouth, and crotch. K.O. said the abuse had been going on since "a little while after his mother passed." K.O. disclosed that Wilde had abused Z.O. too. K.O. was worried Mason would confront Wilde, but agreed to let him tell Wilde's mother, Diane. Mason called Diane that same night, telling her they need to talk soon. But before that conversation occurred, on Labor Day, K.O. told Mason: "It happened again." As proof, K.O. led Mason to Wilde's bedroom and pointed to K.O.'s clothes on the floor.

When Mason told Diane, she did not report Wilde's offenses. Instead, K.O recalled his "granny" advising him not to tell anybody about the abuse "or it will make it weird." Diane also posted a cryptic message on Facebook, saying: "you know what you're doing." Wilde's sister, Rebecca, saw their mother's post and assumed it was about another sibling who had a "drug habit." Eventually, Diane shared with Rebecca that the post was about Wilde. When Rebecca learned of the sexual-abuse allegations against her brother, she contacted authorities.

After some initial reluctance, K.O. told a child protection worker that Wilde had been sexually abusing him. Both boys underwent physical exams and forensic interviews at the child protection center. A nurse practitioner found no physical signs of abuse. In their interviews, both boys gave consistent accounts of performing sex acts at their father's direction. The next day, Officer Katie Burkhardt obtained a search warrant for Lot 41. When officers arrived to execute the warrant, Wilde refused to open the door for nearly ten minutes. When he did appear, he was wearing a holstered gun. Officers seized the gun and Wilde's cell phone before taking him to the police station for questioning.

At the station, Officer Burkhardt interviewed Wilde. He described his relationship with the boys as distant, telling Burkhardt: "I blame them for the death of my partner." After Burkhardt informed him of the sexual-abuse allegations, Wilde said: "I don't believe I've done anything like that." When asked about Diane's Facebook post, Wilde said he hadn't seen it. He also implied his sister, Rebecca, coached the boys. Burkhardt then arrested Wilde for sexual abuse.

Following Wilde's arrest, Rebecca went to Lot 41 to get clothes for K.O. and Z.O. While she was there, she ran into Mateo. According to her testimony, "he

shared with me a sexual fetish called cubbies," which she understood as a subgroup of the "furries" devoted to child sexual abuse. Mateo said he had seen Wilde "watching this cubbies thing, and it disturbed me." Rebecca shared this information with Officer Burkhardt.

Meanwhile, law enforcement extracted downloads from Wilde's cell phone. One was a screenshot of Diane's Facebook post. The phone also contained videos that Wilde had recorded the day of his arrest. As the district court observed: "It is apparent from a review of the videos the defendant was making a last will and testament." Finally, related to Rebecca's tip about the "cubby" fetish, Burkhardt found three pornographic cartoons featuring anthropomorphic animals, captioned as fathers and sons engaged in sexual conduct. Stored on Wilde's cell phone, those cartoons were last viewed in October 2019.

By trial information, the State charged Wilde with six counts:

(1) continuous sexual abuse of a child, a class "B" felony, in violation of Iowa Code section 709.23(2) (2020) for committing sex acts against K.O. between July and September 2020;

(2) second-degree sexual abuse, a class "B" felony, in violation of section 709.3, for committing sex acts against K.O. between May 2015 and January 2017;

(3) second-degree sexual abuse, a class "B" felony, in violation of section 709.3, for committing sex acts against K.O. between January 2017 and January 2019;

(4) second-degree sexual abuse, a class "B" felony, in violation of section 709.3, for committing sex acts against K.O. between January 2019 and June 2020;

(5) second-degree sexual abuse, a class "B" felony, in violation of section 709.3, for committing sex acts against Z.O. between January and September 2020; and

(6) indecent contact with a child, an aggravated misdemeanor, in violation of section 709.12(1)(c), for soliciting K.O. to perform certain acts between 2015 and 2020.

While in jail pretrial, Wilde kept in touch with Diane, as well as Mason, Mateo, and the other men living at the trailer lots. He sent letters addressing what each person should say at trial.

Also pretrial, Wilde moved to exclude the cartoons found on his cellphone under Iowa Rule of Evidence 5.404(b). The State resisted, claiming the cartoons were relevant to identity, knowledge, absence of mistake, and intent. The district court allowed the State to offer two of the three cartoons, finding their depictions of oral and anal sex between animal figures portrayed as fathers and sons were "strikingly similar" to the crimes at hand. The court excluded a third cartoon depicting bondage. Following this ruling, Wilde waived his right to a jury trial.

At his bench trial, both K.O. and Z.O. testified to performing sex acts as demanded by their father. K.O. also said Wilde sometimes solicited him to "nibble" on Wilde's nipples during the sex acts. Wilde's impeachment of the State's witnesses focused on inconsistencies in the timeline of the alleged sex acts. The

defense offered testimony from men who lived with Wilde and K.O.'s former pre-school social worker who did not see "red flags" in his interactions with his sons.

The district court found Wilde guilty on all six counts. At sentencing, the court imposed indeterminate terms of fifty years for the continuous sexual-abuse count, twenty-five years for each second-degree abuse count, and two years for the indecent contact offense. The court ran the indecent contact and the three sexual abuse counts involving K.O. concurrent with each other, but consecutive to the continuous sexual-abuse count and the sexual-abuse offense against Z.O. The full sentence was a term not to exceed one-hundred years in prison.

Wilde appeals, raising three issues.

## II.      Analysis

## A.      Substantial Evidence of Wilde's Guilt

Wilde contends the State presented insufficient evidence to convict him of five of his six offenses.[2] We review his challenge for legal error. *See State v. Banes*, 910 N.W.2d 634, 637 (Iowa Ct. App. 2018). Our sufficiency review is the same for a bench trial as a jury trial. *State v. Myers*, 924 N.W.2d 823, 827 (Iowa 2019). The court's findings of fact have the effect of a special verdict—binding on appeal if supported by substantial evidence. *State v. Fordyce*, 940 N.W.2d 419,

---

[2] Wilde does not raise a sufficiency challenge to count IV, second-degree sexual abuse against K.O. between January 2019 and June 2020.

425 (Iowa 2020). We view the record in the light most favorable to the court's decision. *Myers*, 924 N.W.2d at 827.

### 1. Continuous sexual abuse of K.O.

To prove continuous sexual abuse, the State must show Wilde engaged in three or more sex acts with K.O. with at least thirty days between the first and last act. *See* Iowa Code § 709.23(1). The trial information alleged abuse from July 1 to September 6, 2020. K.O. testified to two specific incidents of sexual abuse by Wilde after they moved into Lot 41. He noted that one occurred around the Fourth of July. He also testified that the frequency of the abuse increased to "a couple times a week" once they moved. And Mason testified that K.O. told him on Labor Day that Wilde had sexually abused him again.

Still, Wilde argues the record lacks the clarity necessary to prove three or more sex acts. He concedes that K.O. elaborated on two incidents of abuse at Lot 41. But he questions the court's finding of the third sex act. The State contends that Wilde's argument "attempts to impose a requirement of specificity in child sexual abuse cases that simply does not exist in the law and would be nearly impossible to satisfy." We agree with the State. "We do not think our legislature intended to impose the strict requirement urged by [Wilde]." *State v. Yeo*, 659 N.W.2d 544, 551 (Iowa 2003). Given K.O.'s testimony about the weekly abuse and the specified timeline from July to September 2020, we find substantial evidence to support Wilde's conviction. *See State v. Bowers*, 661 N.W.2d 536, 543–44 (Iowa 2003) (finding victim testimony that sexual abuse occurred one to three times a week for a year was permissible for a charge of four counts of second-degree sexual abuse).

### *2. Second-degree sexual abuse of K.O. and Z.O.*

For second-degree sexual abuse, the State must show a sex act occurred between Wilde and a child under the age of twelve.  Iowa Code § 709.3(b).  Wilde does not dispute that K.O. and Z.O. were under twelve for all dates alleged.  Instead, he flags discrepancies in their accounts of how old they were, where they went to school, or where they lived at the time of the abuse described.  Wilde argues their imprecise testimony casts doubt on their credibility and cannot prove three of the sexual-abuse convictions because their recollections contradict the time periods alleged by the State.[3]

We disagree with Wilde on this point.  The specific times and places of the sex acts were not material elements of second-degree sexual abuse.  *State v. Griffin*, 386 N.W.2d 529, 532 (Iowa Ct. App.1986); *see also State v. Brown*, 400 N.W.2d 74, 77 (Iowa Ct. App.1986) ("The date fixed in the indictment or information for the commission of a crime is not material, and a conviction can be returned upon any date within the statute of limitations . . . .").  Any inconsistencies as to when or where the incidents occurred did not fatally undermine the court's finding of guilt.  *See State v. Laffey*, 600 N.W.2d 57, 60 (Iowa 1999).

Determining the credibility of K.O. and Z.O. was the fact finder's function.  *See State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006).  The district court found the boys' accounts to be consistent and believable.  The court noted any inconsistencies were outweighed by their detailed descriptions of Wilde's abuse.

---

[3] In his sufficiency argument, Wilde also calls our attention to the district court's reliance on hearsay for count II.  But for sufficiency purposes, we consider all evidence presented at trial even if wrongly admitted.  *State v. Dullard*, 668 N.W.2d 585, 597 (Iowa 2003).

We defer to those credibility findings. Thus, substantial evidence existed for each of Wilde's challenged convictions for second-degree sexual abuse.

### 3. Indecent Contact with K.O.

To show Wilde had indecent contact with a child, the State had to prove he solicited a child to touch him for the purpose of sexual desire. *See* Iowa Code § 709.12(1)(a). K.O. testified that sometimes while performing sex acts, he would be told to put his mouth on his father's nipples—an act he called "nibbling."

Wilde again protests the lack of details for when or where that indecent contact occurred. Pointing to K.O.'s testimony about performing sex acts during the Minnesota state fair trip, Wilde questions the territorial jurisdiction for this count. *See State v. Liggins*, 524 N.W.2d 181, 185 (Iowa 1994). But we are not convinced by Wilde's attempt to splice together separate parts of K.O.'s testimony.

When discussing the sexual favors his father demanded before taking him out of state, K.O. did not list "nibbling" as part of the deal. True, when asked whether Wilde solicited him to "nibble" while they lived in Cedar Falls, K.O. responded, "I think so, but I'm not sure." But such uncertainty or lack of detail from a child witness is no surprise. *State v. Donahue*, 957 N.W.2d 1, 10–11 (Iowa 2021). The fact finder was free to weigh K.O.'s imprecision in the context of his other testimony. Considering the whole record, the fact finder could find indecent contact occurred in Black Hawk County during the five years alleged.

Thus, viewing the evidence in the light most favorable to the district court's ruling, substantial evidence supports Wilde's conviction for indecent contact.

## B.     Bad Acts Challenge

Wilde next contends the district court abused its discretion in admitting the two cartoons stored on his cell phone.  He argues the images should have been excluded under Iowa Rule of Evidence 5.404(b).  Under that rule, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Iowa R. Evid. 5.404(b)(1).  In other words, the rule prohibits evidence that "serves no purpose except to show the defendant is a bad person."  *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001).  But such evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Iowa R. Evid. 5.404(b)(2).

Our supreme court has described rule 5.404(b) as a rule of exclusion: unless the prosecutor can voice a legitimate, noncharacter theory of admissibility for the bad-acts evidence, such evidence is out.  *See State v. Thoren*, 970 N.W.2d 611, 625 (Iowa 2022).  Admissibility depends on three questions: (1) was the evidence relevant to a disputed factual issue, (2) is there clear proof the defendant engaged in the act, and (3) does the danger of unfair prejudice from its admission substantially outweigh the act's probative value?  *Id.* at 626.

Pretrial, the court determined the cartoons were relevant to prove Wilde's identity as the perpetrator, and found a "striking similarity" between the acts depicted in the cartoons and the crimes charged.  Beyond that basis, the court found the cartoons were relevant to prove Wilde's specific intent for the indecent

contact charge and his overall motive.  On appeal, Wilde contests each of those grounds for admissibility.  We consider his arguments in turn.

### 1.  Legitimate, non-character purpose

*Identity.*  The identity of the perpetrator may be a noncharacter purpose for admitting child pornography in a sexual-abuse case.  *See State v. Putman*, 848 N.W.2d 1, 10 (Iowa 2014).  In *Putman*, "identity was the only disputed issue . . . as the defense sought to shift responsibility for the crime onto the victim's father."  *Id.* But, as Wilde points out, "identity was never an issue in the trial court proceedings." Both children testified that their father was the perpetrator.  His defense was a general denial, not an effort to shift blame onto another person.

The district court acknowledged that given the testimony of K.O. and Z.O., this case was not a "whodunnit."  But the court still believed that because the State had to prove identity beyond a reasonable doubt, the cartoons were relevant for that purpose.  That reasoning, according to Wilde, cannot survive the recent analysis of rule 5.404(b) in *Thoren*, 970 N.W.2d at 631.  *Thoren* distinguished *Putman* because "the culprit's identity was disputed there," which made modus operandi evidence relevant.  970 N.W.2d at 631 n.6; *accord State v. Cox*, 781 N.W.2d 757, 770 (Iowa 2010) ("Modus operandi is typically relevant as a subset of identity." (citation omitted)).

We agree with Wilde's reading of *Thoren*.  While the State must prove identity in every criminal prosecution, bad-acts evidence is relevant only when the culprit's identity is contested.  To say otherwise, would defeat rule 5.404(b)'s purpose because "if there is no real dispute, 'the only relevancy of such evidence is to show the defendant's criminal disposition or propensity to commit the very

crime for which the defendant is on trial.'" *State v. Richards*, 879 N.W.2d 140, 147 (Iowa 2016) (citations omitted).

Recognizing that identity was "not explicitly argued at trial," the State creates a boogeyman argument: Wilde *could* have tried to shift blame to the "numerous young men—friends and lovers of the defendant who all identified as 'furries'—liv[ing] with Wilde and the boys at various times and help[ing] take care of the children." From that suggestion, the State proposes:

> Under these circumstances, a reasonable factfinder could easily conclude that *someone* with access to the children sexually abused them. A reasonable factfinder might also discount the possibility of a young father raping his own sons in favor of a conclusion that one of Wilde's transient roommates was the guilty party.

If Wilde had pursued that defense, the State might have a point. But he didn't.[4] Bad-acts evidence must be relevant to a *legitimate* issue. *Cox*, 781 N.W.2d at 771. If Wilde argued at trial that another person sexually abused his sons, and the sons did not identify the perpetrator, a "strikingly similar" bad act could be allowed to show that Wilde committed the crime. *See id.* But identity was not at issue because K.O. and Z.O. could identify Wilde. Thus, the cartoons were not admissible for this purpose.

*Motive or Intent.* While the district court lumps motive together with intent in finding the cartoons admissible, the terms are not "synonyms for the same concept." *Thoren*, 970 N.W.2d at 627. So we consider motive detached from intent. Motive is "the impetus that supplies the reason for a person to commit a

---

[4] Indeed, this shift in blame would have been a difficult argument for the defense to make when K.O. testified the abuse started before any other men moved in. And K.O. trusted Mason, one of the roommates, for his original disclosure of Wilde's sexual abuse.

criminal act." *Id.* (citing *Putman*, 848 N.W.2d at 10). Motive is rarely an element of an offense, but bad acts "may be relevant to provide context and help explain why the defendant committed the charged acts." *Id.* at 628.

On motive, Wilde argues that the cartoons retrieved from his cell phone do not show his impetus for committing the crimes alleged. And the State acknowledges that our supreme court has held that evidence of child pornography cannot be admitted to prove the alleged perpetrator's motive. *See id.* (citing *Putman*, 848 N.W.2d at 10 ("The perpetrator's motive for sexually abusing L.R. was not a legitimate or disputed issue in this case.")). We must follow *Thoren* and *Putman* on the motive question.

As for intent, the district court found the cartoons relevant to prove Wilde's sexual purpose in soliciting indecent contact with a child. *See* Iowa Code § 709.12 (requiring proof that touching was "for the purpose of arousing or satisfying the sexual desire" of either the defendant or the child). Again, Wilde relies on *Thoren* to rebut the district court's rationale. *Thoren* explained: "[T]he elements of a charged offense do not automatically become legitimate, disputed factual issues in a case." 970 N.W.2d at 629. It continued, "Because many crimes require some showing of mens rea, admitting prior bad acts testimony every time a charge includes some notion of specific intent would eviscerate rule 5.404(b)." *Id.* at 630. *Thoren* held the district court "abused its discretion in allowing the State to use testimony from Thoren's former clients to prove motive or intent." *Id.*

Like *Thoren*, Wilde did not advance a defense contesting the sexual purpose of his contact with K.O. As the case was tried, the cartoons were not relevant to the specific intent element of indecent contact. *See Thompson v.*

*United States*, 546 A.2d 414, 422 (D.C. 1988) ("Where intent is merely a formal issue derived from the elements of the offense, and is not being controverted, the argument for receiving [bad-acts] evidence falters."). Thus, the district court abused its discretion.

The State must prosecute Wilde based on what he did, not based on his bad character for storing these pornographic cartoons on his cell phone. *See State v. Sullivan*, 679 N.W.2d 19, 23 (Iowa 2004). Because the disputed evidence was not relevant to a legitimate non-character purpose, we need not weigh its probative value against the danger of unfair prejudice.

### 2. Harmless Error

The State alternatively argues any error in admitting the cartoons was harmless.[5] For evidentiary errors not involving the constitution, we presume prejudice and reverse unless the record shows otherwise. *Id.* at 30. In the State's view, reversal is not required for two reasons. First, a judge, not a jury, determined Wilde's guilt. The prejudicial effect of bad-acts evidence is reduced in the context of a bench trial. *State v. Casady*, 491 N.W.2d 782, 786 (Iowa 1992). Second, the court's reasoning is plain from its written verdict. The State presented strong evidence of Wilde's guilt through the consistent testimony of his two sons. The court found the boys' testimony to be "extremely credible." While the court

---

[5] Wilde urges us to use the harmless-error analysis for constitutional errors, contending he was forced to waive a jury trial because of the pretrial ruling on his bad-acts claim. But his voluntary decision to waive his right to a jury as a matter of strategy does not transform his evidentiary claim into one of constitutional magnitude. "The criminal process includes many situations which require a defendant to make difficult judgments regarding which course to follow." *State v. Gay*, 526 N.W.2d 294, 297 (Iowa 1995).

discussed the cartoons, they were not a central feature of its sufficiency analysis. On this record, we agree with the State. Admission of the two cartoons was harmless.

**C.    Hearsay Challenge**

Wilde next challenges hearsay statements by K.O. offered through Heidi Schoellen and her son, Austin. On the witness stand, Austin recalled a conversation they had when he was fifteen and K.O. was "three or four years old."[6] Austin testified that he noticed K.O. had "farted a decent bit," so he suggested the child use the restroom because "he was potty training at the time." The prosecutor asked whether K.O. then "described something about his ability to use the restroom." Austin said "yes" and, over a hearsay objection, recounted that K.O. said that "his father had put his pee pee in his butt and it hurt." In earlier testimony, also over a hearsay objection, Heidi too recalled that K.O. "said he couldn't poop because it hurt because of that reason." On cross-examination, Heidi conceded that she did not hear K.O. say those words; Austin told her about it.

In response to the defense objections, the State insisted that K.O.'s statements fell under hearsay exceptions for present sense impressions and then-existing physical conditions. *See* Iowa R. Evid. 5.803(1), (3).[7] The court declined

---

[6] The trial testimony and appellate briefing include conflicting references to K.O.'s age when he made the statement. But based on K.O.'s birth date, he would have been three.

[7] That rule provides:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> (1) *Present sense impression.* A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it.
>
> . . . .

to rule on the hearsay objections in real time, asserting because it was a bench trial the court could wait until its written ruling to determine admissibility. Yet the written ruling did not address the evidentiary question. But as the State acknowledges on appeal, because the court considered the hearsay statements in its fact findings, it implicitly overruled the objections.

### 1. Present Sense Impression

Wilde now argues that the hearsay was improperly admitted and presumed prejudicial. He attacks both exceptions.[8] But the State defends admission of the hearsay only as a present sense impression.[9] So we focus on that exception.

"The rationale behind the present sense impression exception is that the declarant has no opportunity to fabricate a statement if the statement is made during or 'immediately' after the event." *State v. Dessinger*, 958 N.W.2d 590, 600 (Iowa 2021*)* (citation omitted). Many cases ponder whether a lapse in time between the event and the statement is tolerable. *See, e.g.*, *Fratzke v. Meyer*, 398 N.W.2d 200, 205 (Iowa Ct. App. 1986) (venturing that "precise contemporaneity is not possible").

---

> (3) *Then-existing mental, emotional, or physical condition.* A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Iowa R. Evid. 5.803.

[8] Wilde notes that Heidi's testimony was double hearsay, repeating her son's out-of-court statement repeating K.O.'s out-of-court statement.

[9] The State concedes on appeal that the part of K.O.'s statement attributing his physical condition to Wilde's sexual abuse is "a statement of memory or belief to prove the fact remembered or believed," which is prohibited by rule 5.803(3).

For K.O.'s statement, each party focuses on a different event or condition. Wilde assumes the event at issue is the alleged sexual abuse, asserting: "the record is unclear as to how much time has elapsed from the event that was given as causation to the description in the hearsay in order to make a determination as to its proximity to the statement." In contrast, the State contends that K.O.'s statement described his condition—an inability to have a bowel movement—while he perceived it. In the State's view, because rule 5.803(1) permits hearsay "explaining" that condition, K.O.'s interpretation of the reason for his constipation was admissible as part of the present sense impression.

At first blush, the State's interpretation of the rule makes sense. But on closer inspection, we hesitate to read "explaining" so broadly. Our hesitation comes from an "analytical distinction" highlighted recently by our supreme court. To qualify as a present sense impression, "the person must be providing a current description of the sensory impressions of an event rather than a mental process." *Dessinger*, 958 N.W.2d at 601. K.O.'s belief that the abuse *caused* his current physical condition reflected his mental process not a sensory impression. Put differently, the exception "applies only to reports of what the declarant has actually observed through the senses, not to what the declarant merely conjectures." *See Brown v. Keane*, 355 F.3d 82, 89 (2d Cir. 2004) (rejecting exception when caller told police that he saw someone "resembling the defendant" firing a gun). To be sure, the State could have offered K.O.'s out-of-court statement describing his inability to defecate as a present sense impression. But K.O.'s conjecture about the cause was inadmissible.

In excluding K.O.'s statement attributing his current physical condition to prior sexual abuse, we consider the intersection between sections (1) and (3) of rule 5.803. A trial handbook explains their differing applications in the context of a personal injury action:

> [A] statement by a person lying in a hospital bed that the person is in pain, and that the pain was caused by someone who went through a red light, would be admissible as a then-existing statement of physical condition as to the pain, but not as to the cause. A statement by the same person writhing in pain at the scene of an accident to the effect that he or she was in extreme pain and feared death because someone had gone through a red light, would be totally admissible as a present sense impression of a contemporaneous event.

Then-existing state of mind, 10 Wis. Prac., Trial Handbook for Wis. Lawyers § 16:10 (3d ed.). K.O.'s statement about the cause of his rectal pain concerned his then-existing state of mind, not his present sense impression of a contemporaneous event. As the State concedes, his statement of memory or belief was excluded under rule 5.803(3). Thus, we find the district court erred in admitting the entirety of K.O.'s statement as a present sense impression.

### 2. Harmless error

As a fallback position, the State argues that we should affirm Wilde's convictions even if the court improperly allowed the hearsay. First, the State argues the hearsay was cumulative to K.O.'s trial testimony. Second, the State notes that similar abuse reports from K.O. to a nurse practitioner came in without objection. The State points out that K.O. maintained that the abuse started after his mother died when he was three years old. Yet the State recognizes that the district court used the Schoellens' testimony to corroborate the timing of the earliest incident of abuse involving K.O. With that recognition, the State contends

the later investigations by social workers and police corroborate those earliest abuse allegations and salvage Wilde's conviction for count II, alleging second-degree sexual abuse for sex acts against K.O. between May 2015 and January 2017.

What the State overlooks is that K.O. did not disclose the abuse during that 2015 investigation, and the police did not find probable cause to charge Wilde based on the Schoellens' reports. Because the wrongly admitted hearsay was the most salient evidence of that early abuse, we find its admission was reversible error for the sexual-abuse allegation in count II.

Thus, we remand to the district court for a new trial on count II. On all other counts, we affirm. Because the district court ran the sentence for count II concurrent to two other sexual-abuse counts and the indecent-contact conviction, resentencing is unnecessary. *See State v. Nall*, 894 N.W.2d 514, 525 (Iowa 2017) (opting to sever judgment and sentence for reversed conviction from remaining sentence).

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**