**IN THE COURT OF APPEALS OF IOWA**

No. 23-1836
Filed April 23, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**EUGENE OCTAVIUS LOVE Jr.,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Black Hawk County, Joel Dalrymple,

Judge.


        A defendant appeals his conviction for first-degree murder.  **AFFIRMED**.


        Martha J. Lucey, State Appellate Defender, and Ella M. Newell (argued),

Assistant Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Kevin Cmelik (argued), Special

Counsel, for appellee.


        Heard at oral argument by Tabor, C.J., and Greer, Schumacher, Langholz,

and Sandy, JJ.

**GREER, Judge.**

Eugene Love Jr. appeals his conviction of first-degree murder, arguing the district court wrongly denied his *Batson* challenge[1] and his subsequent motion for mistrial related to that claim. Love also argues the court erred when it denied his motion to admit hearsay evidence about the victim, Courtney Harris, under the rule of completeness. Finally, Love contends the court abused its discretion when the court found his expert's testimony to be irrelevant to the factual questions reserved for the jury.

After reviewing each of Love's arguments, we affirm his conviction.

## I. Background Facts and Proceedings.

Love and Harris were once good friends but, in the year before Harris's death, had a falling out. They ran into each other on January 2, 2022, at a local gas station. The interaction was tense, with Harris allegedly threatening Love and his girlfriend, Chylea Brown, even aggressively following her after she had dropped off Love. On January 8, Love directed Brown to drive him to a convenience store. Harris's car was stopped in the drive-through lane. Love exited the vehicle, walked to the side of Harris's car, and fired several rounds from a gun he borrowed from a friend, Kalani Moore, into Harris's vehicle. Harris was struck in the arm and the head; he died at the scene.

Love returned to Brown's vehicle and told her to drive, fleeing the scene. In the aftermath of the shooting, Love attempted to cover his tracks by bleaching the

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 96–98 (1986) (addressing the three-step inquiry required when a party challenges the State's use of a peremptory strike that is alleged to be improperly motivated by racial discrimination in violation of the Equal Protection Clause).

doorhandles of Brown's car, burning his clothes on the side of the road, and burying the weapon in Minnesota. Along with video evidence of the scene, investigators relied on physical evidence and cell phone data to piece together the locations and movements of the various participants. After an investigation, Love was charged with murder in the first degree, in violation of Iowa Code section 707.2 (2022).

Before trial commenced, Love gave notice of his intent to offer evidence of self-defense. Prior to trial, Love provided Dr. Frank DiCataldo's expert report, which disclosed the expert's opinions on Love's "developing adolescent or emerging adult brain and trauma history" in the context of self-defense. The State resisted. After the court listened to the parties' arguments at a pre-trial conference, the court reserved judgment on the matter until "further record and an offer of proof from the defense." Both parties moved in limine. The State's motion focused on the evidentiary basis for Love's potential self-defense claim. The court found no nexus between Love's behavior at the time of the shooting and self-defense, although the court left the door open for Love to lay a proper foundation. At trial, Love abandoned his purported self-defense claim and pivoted to proving a theory of the lesser-included charge of voluntary manslaughter. The court and the parties discussed Love's request for a voluntary-manslaughter instruction before Dr. DiCataldo's offer of proof. After hearing the offer of proof, the court excluded the testimony of Dr. DiCataldo and ultimately refused to instruct on the crime of voluntary manslaughter.

After a seven-day trial, a jury found Love guilty of first-degree murder. In a subsequent sentencing hearing, he was sentenced to life in prison without the

possibility of parole and ordered to pay restitution in the amount of $150,000. Love appeals.

## II. Discussion.

On appeal, Love raises four arguments. The first two arguments concern the composition of the jury—he argues the district court wrongly denied his *Batson* challenge to Juror 35, who identified as African American, and erred in denying his motion for mistrial after every African American juror was struck during jury selection. Love raises one evidentiary argument, contending the district court erred when it did not admit the whole of a reported conversation under Iowa's rule of completeness. Finally, Love argues the district court abused its discretion when it did not allow his expert, Dr. DiCataldo, to testify to the subjective components of voluntary manslaughter. We evaluate each argument in turn.

## A. *Batson* Challenge.

Love alleges the State's use of a peremptory strike during jury selection was improperly motivated by racial discrimination or bias. Such an allegation invokes the Equal Protection Clauses of the United States and Iowa Constitutions. U.S. Const. amend. XIV; Iowa Const. art. I, § 6; *see Batson*, 476 U.S. at 83. We review constitutional issues de novo. *See State v. Booker*, 989 N.W.2d 621, 627 (Iowa 2023). But we give "a great deal of deference to the district court's evaluation of credibility when determining the true motives of the attorney when making strikes." *State v. Mootz*, 808 N.W.2d 207, 214 (Iowa 2012).

*Batson* set forth a three-step burden-shifting framework to evaluate if a preemptory strike was improperly rooted in racial discrimination. 476 U.S. at 96–98. After initiating a *Batson* challenge, the initial burden lies with the challenging

party, in this case, Love. *See id.* at 96. He "must [(1)] establish a prima facie case of purposeful racial discrimination in the peremptory strike." *Booker*, 989 N.W.2d at 627. Then "(2) the striking party (here, the State) must proffer a race-neutral explanation for the strike." *Id.* After a sufficient race-neutral explanation is supplied, the burden then shifts back to Love to (3) "carry the ultimate burden of proving purposeful discrimination." *Id.*

On appeal, neither Love nor the State contests that Love set forth a sufficient prima facie case of discrimination "by showing that the prosecutor . . . exercised one or more peremptory challenges to remove from the venire members of a racial minority and that these facts and other relevant circumstances raise an inference of discrimination", *State v. Veal*, 930 N.W.2d 319, 332 (Iowa 2019), and that the State offered a race-neutral explanation in response. Love challenges step three—the district court's determination Love failed to carry his final burden of showing purposeful discrimination.

We start with the record made during jury selection. During initial questioning, Juror 35 reported that she knew individuals involved in this case, including several witnesses, Love, and Harris. From there, the State asked for specifics as to Juror 35's relationship with parties involved in the case. First, the State inquired about Kalani Moore, a key witness, and Juror 35's relationship:

> Q. How do you know Kalani [Moore]? A. From school.
> Q. From East again? A. Yeah. And the friend of a friend.
> Q. Is there anything about that relationship that you think would affect your decision making in this case? A. No.
> Q. Do you know, I mean, do you know [Moore's] reputation or what do you know about him? A. Oh, I really don't know much about him. I just, you know, one of my friends, we hang out together sometimes.

The State then inquired about Juror 35's relationship with Love:

> Q. Okay. And then [Love] and you said you knew him from East? A. (Nodding head).
> Q. Is that a yes? Sorry. A. Sorry, yeah.
> Q. And were you close with him? A. Hung out a few times.
> Q. So outside of school you hung out? A. Yeah, with my friend.

Then the State explored Juror 35's relationship with the Harris:

> Q. Okay. And you said you knew Courtney Harris? A. Um-hmm.
> Q. What do you know about [Harris]? A. Went to school with him also.
> Q. What do you know about him? A. He—he played football with my brother. Plus, again, he's a friend of my friend.
> Q. Did you ever hang out with [Harris] outside of school? A. No.
> Q. Do you know anything about his reputation? A. No.

Interspersed between discussions of various relationships, the State asked if these relationships would prevent Juror 35 from being impartial:

> Q. Is there anything about that relationship that you think would affect your decision? I mean, [Love's] on trial for murder. A. Yes. Yes, that's not something I want to do because . . .
> Q. Why not? A. Because I don't—I don't know. That's weird to have to judge somebody that you know from before and been around.
> Q. Do you think that you, if you were presented with all of the evidence, that you would not be able to find [Love] guilty of murder? A. I don't know.
> Q. I mean, if the State presents evidence that shows that he committed a crime— A. Yeah.
> Q. —would you be able to find him guilty? A. Yeah. I think so.
> Q. You think so. What's making you hesitate? A. Well, because I think people make mistakes. I don't know. It's just the way I think sometimes.
> Q. Do you think that, you know, if the scales are equal in the case and the State's over here and [Love] is over here, do you think that you're already kind of favoring [Love]? Siding with [Love] a little bit more or that it would be harder for the State to prove that he was guilty compared to somebody you didn't know? A. No.

(Ellipsis in original.)  And, again:

> Q. Do you think that you're going to be a fair juror on this case considering you know so many of the people involved?  A. I don't—I don't know.  I feel like people—knowing people makes you more biased to agree with them.  Does that make sense?
> Q. Yes.  You're stating that generally.  Do you think you knowing people is going to make you more biased to favor them?  A. Yeah.
> Q. And that would be—you think you would be more in favor of [Love] than somebody else that you didn't know?  A. Yeah.

During Love's opportunity to question potential jurors, Love asked for clarification:

> Q. I just want to be sure I'm hearing you correctly.  So do you think that you are more likely to find him not guilty just because he's Eugene Love than if you were on a different trial?  A. No.
> Q. All right.  It sounds like you also know . . . [Moore]?  A. Um-hmm.
> Q. Okay.  I don't have any other questions.  Thank you.

In response to a question about law enforcement, Juror 35 mentioned that police do not always help the situation and that a family member previously had a bad experience with a police officer in the community.

The parties continued questioning other potential jury members, including Juror 163, identified as a white female juror, who reported having a connection to Harris and knowing some details about the case:

> I have a cousin and a really close friend, friends with [Harris], so obviously their family is, you know, saying, you know, this happened or that happened, which I don't recall specifics at this moment.  And I have mutual friends that know him that, you know, have said this or that.

After the questioning of potential jury members finished, each party exercised its strikes.  The State struck both Juror 163 and Juror 35.  Love made the following *Batson* challenge:

We made a *Batson* challenge again with regard to the State's next strike of number 35. She is a member of a protected class. She is a Black woman. She is the last remaining Black person on this jury. They exercised a preemptory challenge for her using their eleventh strike.

We believe that they have not established a race neutral reason and I, again, want to state the same thing is that we try to make all these efforts to get a jury of Mr. Love's peers but it's nearly impossible to do so when the State's able to strike everyone that we have on the jury.

The first person we lost I think was because her husband was being prosecuted by a county attorney here. The next one we lost had a felony record. Now this one I'm sure the State will say that she's had a bad experience with police.

It's no surprise that a Black person has had a bad experience with police and that should not count or be considered as a race neutral reason to strike somebody as a juror in this case. I think if there are any statistics done on that, you would find that Black people are far more likely to have negative experiences with police than white people. And I—and the State will probably also say that she knows people in the case, but she knows people on both sides of the case so I don't know. That's all. Thank you.

The burden then shifted to the State, where the State conceded Juror 35 was a member of a protected class and explained its reasons behind the preemptory strike:

Your Honor, the State is striking Juror Number 35 because of her relationship with the parties in this case. Specifically her relationship with Eugene Love. It was her statement when she was called back to discuss her knowledge of several of the witnesses in this case, . . . Kalani Moore, Eugene Love, and Courtney Harris. All people involved in this case. Two of them are State's witnesses, one of them is [Love], and one of them is the [Harris] in this case. And this particular juror knows all of them.

While she said that she had a friend of a friend relationship with [one other witness], with [Moore], and with [Harris], she was very specific that with [Love] they would hang out; that they hung out three or four times outside of school with one of her friends; that she would be more in favor of [Love]. Those were her statements.

*Her ancillary knowledge about what may or may not have happened, the reputation of Courtney Harris, the reputation of Eugene Love, is the same reason why the State struck Juror Number 163 who also came back here and said that she knew both sides of this incident, that she had heard through other people or*

*through word of mouth what happened and the State also struck her.* She's a white female.

The State does not want jurors who know about the parties to potentially go back to the jury room and base their decision in the case on their previous experiences with the parties in the case. And that is a race neutral reason. It wouldn't matter to the State whether Juror Number 35 were Black or white. If they had hung out and spent time with Eugene Love outside of a school setting in an interpersonal relationship, that would be the same reason to strike this juror, and it was the same reason that the State used to strike Juror 163 who was in the general pool.

So that is the race neutral reason. And while we understand that that depletes the number of African American people in this panel, the State also can't or shouldn't be forced just based on *Batson* to have jurors in the case who know about the facts of the case, about the parties in the case, whether or not Eugene Love had a reputation for violence or had a reputation for nonviolence, whether Courtney Harris had a reputation for violence or nonviolence. Those are things that these jurors, 163 and 35, could share with the rest of the jury panel, and the State wants this case tried as the jury instructions require based on the facts and evidence presented from the witness stand in this case. So that's the reason and it is race neutral.

(Emphasis added.)

Love points to the State's given reasons for striking Juror 35 and highlights a misstatement the State made that Juror 35 had knowledge of the incident. In addition, Love argues that a comparison of the depth and scope of questioning of Juror 163 and Juror 35 demonstrated "pretextual discriminatory intent." Questions directed to Juror 163 went to that potential juror's statements that some information about the case from Harris's family and questions to Juror 35 pinpointed details of the relationships to Harris, Love, and the witnesses based upon those disclosures. And, although the State referenced in its reasons that Juror 35 had some "ancillary knowledge" about what happened, which is a misstatement of the record as the potential juror was not asked about that, the court found the race-neutral reasons

for the strike were found in several responses related specifically to Love, including that she actually "hung out" with him. And even more, the court stated:

> [Juror 35] said, upon being asked by counsel, her response was I don't want to be on this jury. And asked why she, in her own words, articulated that it was weird to have to judge somebody she knew. Her—one of her responses was she didn't know if she could find him guilty. Upon re-examination by [Love] she was—or she did say if presented with evidence could she do so, her response was, quote, I think so.
>
> There was a question as to why she did hesitate with that response and her answer was because people make mistakes, which really isn't an issue of whether the State's proven an element or not, whether a mistake was made that led to the commission of a crime. But the State's articulated her knowledge of [Love], the State's articulated her relation to [Love] as well as her knowledge and relation to other witnesses in this case, which are all race neutral reasons articulated by the State which is key.
>
> It's not the Court's interpretation of her statements. It's the State's position as to why it's—the State has exercised their strikes. I do find those to be race neutral. I do find that they have merit.

Parties cannot use a preemptory strike as a vehicle to strike a juror based on race. *See Batson*, 476 U.S. at 89 ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."). "When a party challenges a peremptory strike as racially discriminatory, *Batson*'s burden-shifting framework resolves the challenge through a three-step inquiry." *Booker*, 989 N.W.2d at 627. At step three, it is both appropriate and necessary for the court to "decide whether to believe the [attorney's] explanation for the peremptory challenges." *Mootz*, 808 N.W.2d at 219 (alteration in original) (citation omitted).

After evaluating these facts on our de novo review to determine "whether, under the totality of the circumstances, the strike was 'motivated in substantial part

by discriminatory intent,'" and after applying the discretion we afford the district court, we find the strike was not racially motivated. *See Booker*, 989 N.W.2d at 630 (citation omitted). Although the State misstated the record as to one of its reasons for its use of the strike, we do not find the other reasons that the court relied upon were "merely pretext for racial discrimination." *Id.*; *accord id.* at 630–31 (noting courts consider if the explanation for the strike is consistent with the record even though part of the explanation was a misstatement). Consistent with the district court's conclusion, we find the State's concerns over Juror 35's pre-existing relationships, along with her hesitation over being able to decide the case given those relationships, are racially-neutral reasons to exercise a preemptory strike. Although we acknowledge that the State's eleventh preemptory strike removed the last African American juror from the pool, we do not find the strike was motivated in substantial part by discriminatory intent. The court properly denied Love's *Batson* challenge.

**B. Denial of Mistrial Motion.**

Immediately after the court denied Love's *Batson* challenge, Love moved for mistrial on the basis that "his right to a fair trial of his peers was violated because all of the Black jurors were struck from the jury pool." Our review of a denial of a motion for mistrial is for an abuse of discretion. *See State v. Brown*, 5 N.W.3d 611, 614–15 (Iowa 2024). We review whether the district court applied the proper standard for errors at law. *Cf. State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). When Love moved for mistrial, he focused on the composition of the jury, arguing:

> I would make a motion for a mistrial then. We had this panel come in. It would have survived anything under *State v. Plain*[, 898 N.W.2d 801 (Iowa 2017)]. We lost two of three Black jurors who

made it into our thirty-six people. Two of those were due to local connections.

    This case hasn't been publicized so much in the newspaper so that a motion for change of venue would have been appropriate. In fact, I have tried to make a motion for a change of venue on these grounds before and was told that that's not the appropriate mechanism to do it. But not being able to seat a jury of your peers because of local connections should also be an allowable ground for a change of venue.

    The U.S. Constitution guarantees Mr. Love the right to a fair trial by a jury of his peers and so does the Iowa Constitution and there should be a procedure in place to avoid this inevitable issue and that would be to have a mistrial today and go somewhere else because we wouldn't run into [Juror] 35 who knows him and we wouldn't run into a person whose spouse is being prosecuted by the Black Hawk County Attorney's Office, and it just—it's going to keep happening and I move for a mistrial.

The court gave the State an opportunity to respond. Pointing to Love's concession that the jury pool was made up of a fair cross-section of the community, as outlined in *Plain*, the State resisted the motion and argued that Love had not identified any viable ground for a mistrial. The court then offered Love the last word, where Love reiterated the motion for mistrial based on the compilation of the empaneled jury and the difficulty of finding people who might not know Love, thus resulting in an "all-white" jury. The court ruled on the motion for mistrial, stating:

    All right. Well, manifest necessity[2] is the doctrine. I don't believe, considering all of the circumstances in this case, arguments of the defense and of the State, that manifest necessity requires declaring a mistrial.
    . . . .
    The issue here is we have, frankly, we still have other African American jurors in the panel that remain. It's just random that they

---

[2] "Under the doctrine of manifest necessity, a court has a duty to declare a mistrial when the ends of public justice demand it." *State v. Harrison*, 578 N.W.2d 234, 238 (Iowa 1998); *see Arizona v. Washington*, 434 U.S. 497, 506 (1978) (requiring the prosecutor to "shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar" by "demonstrate[ing] 'manifest necessity' for any mistrial declared over the objection of the defendant").

were not called. That's the random nature of this. And so the motion is going to be denied.

On appeal, Love argues that because the court applied an incorrect standard to its analysis, it did not properly assess whether a mistrial was required as an appropriate remedy under Iowa Rule of Criminal Procedure 2.19(5) due to the composition of the jury. We agree with both parties that the wrong standard was applied by the court.

The State argues that Love did not preserve error because he did not object or clarify to the court that an improper standard was applied. But we choose to consider Love's challenge as articulated on appeal.

Love only argues that "[h]ad the [d]istrict [c]ourt applied the correct standard, it would have granted Mr. Love's motion." We cannot reach that same conclusion. When moving for mistrial, Love acknowledged to the court that "[w]e had this panel come in. It would have survived anything under *State v. Plain*." *See* 898 N.W.2d at 827–29 (outlining the three-part test for establishing the jury pool violated the defendant's constitutional right to an impartial jury drawn from a fair cross-section of the community). And although Love would have preferred that an African American juror sit on the jury, there is no authority requiring that result when the jury panel meets the standards as set out in *Plain*. *See State v. Mong*, 988 N.W.2d 305, 311 (Iowa 2023) ("Our cases recognize the fair-cross-section right extends only 'to the jury pool' and not to the jury panel or the petit jury.").

Love argues the district court did not review the factors in Iowa Rule of Criminal Procedure 2.19(5)(a)(1),[3] but he offers little detail as to how those factors

---

[3] Rule 2.19(5)(a)(1) provides the reasons the court may declare a mistrial:

should guide the court's analysis. Conclusory statements are not arguments. *Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [the party] might have made and then search for legal authority and comb the record for facts to support such arguments."). Without argument from Love to the contrary, we find that application of the correct standard—"[a] mistrial is appropriate when 'an impartial verdict cannot be reached' or the verdict 'would have to be reversed on appeal due to an obvious procedural error in the trial,'"— would have yielded the same result at the district court. *See State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006) (citation omitted).

**C. Iowa Rule of Evidence 5.106.**

Love lodges an evidentiary argument on appeal, contending the district court erred when it refused to allow Moore to testify about Harris's threats to Love before the shooting. He argues the testimony should have been admitted under Iowa Rule of Evidence 5.106. "District court decisions on whether to admit or exclude evidence are typically reviewed for an abuse of discretion." *State v. Dessinger*, 958 N.W.2d 590, 597 (Iowa 2021). But hearsay claims are reviewed for correction of errors at law. *Id.*

Iowa Rule of Evidence 5.106 states:

> a. If a party introduces all or part of an act, declaration, conversation, writing, or recorded statement, an adverse party may require the introduction, at that time, of any other part or any other

---

1. Because of any accident or calamity requiring termination of the trial upon motion of a party for cause shown.
2. When a required continuance would make it impractical to proceed with the same jury.
3. When the jurors have deliberated until it satisfactorily appears that they cannot agree.
4. Because of an error resulting in the denial of a fair trial.

act, declaration, conversation, writing, or recorded statement that in fairness ought to be considered at the same time.

b. Upon an adverse party's request, the court may require the offering party to introduce at the same time with all or part of the act, declaration, conversation, writing, or recorded statement, any other part or any other act, declaration, conversation, writing, or recorded statement that is admissible under rule 5.106(a). Rule 5.106(b), however, does not limit the right of any party to develop further on cross-examination or in the party's case in chief matters admissible under rule 5.106(a).

This is referred to as the rule of completeness. *State v. Huser*, 894 N.W.2d 472, 507 (Iowa 2017). During trial, Love did not alert the court to rule 5.106 by name.[4]

Moore was first called as a witness by the State. His testimony established that he gave Love a Beretta gun "for his protection." Asked if giving Love the gun was "based on a circumstance that [he] found out involving Courtney Harris," Moore answered "yes." Moore explained "[t]hat [Harris] was threatening [Love] and his girlfriend and he was following them and I think he also followed his girlfriend when she was alone." Moore noted he wanted Love to "be safe in the situation." Likewise, when explaining the aftermath of the shooting, Moore testified that afterward "[Love] was scared about the whole situation and ended up doing something stupid out of—out of fear." Love attempted to introduce other evidence to more fully explain the reasons for his fear, including that Harris might have a

---

[4] The State contends that Love did not preserve error on this issue. But we find Love's responses to the State's objections sufficiently alerted the district court to Love's position, which is now being advocated on appeal. In response to the State's objection to the introduction of the evidence, Love asserted: "It's the complete context of what he was told," and later, "I understand that it is [hearsay], but the State opened the door to that specific line of questioning. It just completes the picture of what these people said to [Moore] about the situation with [Harris] so I think it is fair for him to testify to it." These were suitably specific to alert the court to the substance of Love's argument even though he did not cite to rule 1.506.

gun. On each attempt the State's hearsay objection was sustained. Ultimately, Love made this offer of proof with Moore:

> Q. So when [Love] and [Brown] told you that [Harris] was threatening them, was it threats to shoot [Love]? A. Yes.
> Q. And did they also tell you that during this incident between them all that [Harris] was acting like he had a gun? A. Yes.

After that offer of proof, Love articulated his position to the district court as follows:

> I guess I just wanted to renew my attempts to get that information in and I just wanted to be heard a little bit more on whether it's hearsay. I understand that it is, but the State opened the door to that specific line of questioning. It just completes the picture of what these people said to [Moore] about the situation with [Harris] so I think it is fair for him to testify to it.

The court excluded the testimony, ruling:

> Okay. Well, it's hearsay, and the objection is it's hearsay. It's an out-of-court statement, particularly of the defendant, offered to prove the truth of the matter asserted. There is no real, I mean, opening the door isn't a recognized exception to hearsay. It's—it is hearsay and it is sustainable so the objection is sustained and will remain sustained.

The State contends that the court did not wrongly exclude this additional testimony for several reasons, but one reason is especially compelling in our view. Because no theory of self-defense was proved, the testimony about a prior threat or concern that Harris carried a gun was not relevant to the issues the jury had to decide. *See* Iowa R. Evid. 5.401 (providing that evidence is relevant when it "has any tendency to make a fact more or less probable than it would be without the evidence" and "[t]he fact is of consequence in determining the action"). "Evidence that is not relevant is not admissible." *State v. Sulivan*, 679 N.W.2d 19, 25 (Iowa 2004); *see* Iowa R. Evid. 5.402. So the district court was not wrong to exclude the additional testimony.

**D. Expert Testimony.**

Last, Love argues the district court abused its discretion excluding expert testimony from Dr. DiCataldo as irrelevant and further that the exclusion of that testimony deprived him of his right to present a defense under the Due Process Clause of the Federal and Iowa constitutions. We review the admissibility of expert testimony for an abuse of discretion. *State v. Schutz*, 579 N.W.2d 317, 319 (Iowa 1998). Where a defendant claims infringement of his constitutional right to present a defense, our review is de novo. *State v. Peterson*, 532 N.W.2d 813, 816 (Iowa Ct. App.1995).

Prior to and during trial, Love made several arguments why Dr. DiCataldo's testimony was relevant. The evolution of Love's arguments began with the pretrial hearing on the motions in limine. But even after Love abandoned his claim of self-defense, he continued advocating for admission of his expert's opinions, arguing:

> So we do not any longer have a self-defense claim in our case, but we are asking permission for our expert to testify in other regards. I mean, generally the information he's providing is about the same, but we believe that the mental state of Eugene Love is relevant to the jury—for the jury to consider in a case for murder in the first degree as the State must prove that he acted willfully, deliberately, premeditatedly, and with a specific intent to kill.
> I also think that he would aid the jury in terms of a voluntary manslaughter defense which is what we are seeking. And for me to get the instruction on voluntary manslaughter we've got to show a couple of things: That the provocation was adequate to inflame a reasonable person; that the defendant did not have time to cool off between the provocation and the killing; the provocation actually impassioned the defendant; and the defendant did not, in fact, cool off before the killing. And so I think that this expert would be beneficial in explaining to the jury the subjective components that we have to show with voluntary manslaughter.

But Love's reasons for seeking the admission also involved showing his "mental state," which he noted was "relevant to murder in the first degree" even though he

confirmed that he was "not going to have Dr. DiCataldo comment on Love's actual state of mind at the time of this incident."  Before making an offer of proof, Love explained additional reasoning for why Dr. DiCataldo's testimony should be admitted:

> I think it would aid the jury because this is based on science to which my expert has a lot of knowledge.  This expert has personally evaluated Mr. Love and is familiar with his situation and his background and would diagnose Mr. Love with post-traumatic stress disorder based on things that he's been through, and we believe that it would be a violation of his constitutional right to present a defense in this case if Dr. DiCataldo is not permitted to testify.

That was the only time a constitutional right was mentioned in the record related to the expert's testimony.[5]

The State objected to Dr. DiCataldo's opinions as hearsay and as an attempt to have the expert act as a stand-in for Love by testifying about Love's history and life without Love having to take the stand.  Additionally, the State contended Love was attempting to "pivot a self-defense justification expert now into a serious provocation expert" for the benefit of a voluntary-manslaughter claim without any evidence that would support either stance.  The court rejected the argument that Dr. DiCataldo's expert report "has a nexus with the history of [Love], the science behind a youthful brain and self-defense and there's no reference whatsoever or connection to this youthful brain and that of the state of mind of

---

[5] Given this limited and imprecise record related to any constitutional challenge, we do not address it further.  *See State v. Bauler*, 8 N.W.3d 892, 907 (Iowa 2024) ("Even issues implicating constitutional rights must be presented to and ruled upon by the district court in order to preserve error for appeal." (citation omitted)); *see also Stammeyer v. Div. of Narcotics Enf't*, 721 N.W.2d 541, 548 (Iowa 2006) ("If the court does not rule on an issue and neither party files a motion requesting the district court to do so, there is nothing before us to review.").

[Love] for the purposes of a voluntary manslaughter type of consideration." After a lengthy offer of proof, the court questioned Dr. Dicataldo about his proposed testimony:

> Q. All right. I just want to make sure I understand your testimony in short. Because of Mr. Love's age, his adolescent or young brain, coupled with whatever trauma that might have occurred in his presence by way of psychological or otherwise, or whether in his personal presence or indirectly I think as you described it, your conclusion is . . . that he might react differently and that he might be hypervigilant, I think was the word that you used, or overly sensitive? A. Your Honor, that is a fair summary, a fair and accurate summary of my testimony this morning.
> Q. And that he might perceive or anticipate more harm than might objectively be the case? Is that fair— A. Yes. Sorry. Yes, I agree.
> Q. And is that—would you distinguish that then, I think as [defense counsel] described it, is that different then from a 40-year-old individual? Just a random 40-year-old individual? I'm sorry. I interrupted you. That was my fault. But just to be clear, that that would be distinguished from just a random 40-year-old individual? A. Yes. In my opinion that would be different than sort of the average, you know, reasonable 40-year-old person.
> Q. And I think you used the key word that I was literally gonna ask you next, is that that's different than a quote-unquote reasonable person. A. I believe a 19-year-old young, late adolescent with a trauma history is significantly different than a reasonable 40-year-old man.

After arguments by the parties, the court reasoned:

> All right. Well, obviously I think the parties picked up on the Court's concern in listening to the testimony of the doctor that this, as the defense has couched this and indicated its use, when the issue of voluntary manslaughter is the focus of the Court, the instruction of the Court is—or the model instruction is governing and it's the Court's focus for the purposes of this ruling and for the purposes of the relevancy of the proffered testimony.
> It's an objective and a subjective standard, and certainly this witness would offer evidence to the subjective benefit of the defendant, but clearly, in the words of the expert himself, objectively it simply isn't relevant. Objectively this defense does not support a submission of voluntary manslaughter. Objectively, the defendant in this particular situation is not, in his own words, the doctor's own words, a reasonable person.

His behavior was not consistent with a reasonable person. It, by his own words, the trauma, the age, the youthful brain collective with the trauma is such that causes the defendant to act differently than a reasonable person. It justifies, at least from the expert's position, and explains why they act differently, but the fact remains is that it is inconsistent with that of a reasonable person. And so objectively speaking it bears no relevance to the instruction or the defense as serious provocation is conduct that would excite an individual, in a reasonable person a sudden, violent, and irresistible passion. And as he's testified under these circumstances, he's not a reasonable person. And in fact, it's pretty clear that's where I was going.

I was, in fact, going to ask him whether the defendant would be deemed a reasonable person or whether his behavior would be a reasonable person. Before I could even ask it the doctor volunteered it and made the distinction on his own. And so I don't find the testimony to be relevant and the Court's ruling is going to be consistent with the ruling before regarding the motion in limine, albeit at this stage of the game an entirely different situation in light of the pivoting, and the Court takes no fault in the defense making that pivot, to be clear, but nonetheless, considering that pivot, the ruling remains the same that the testimony is not relevant to the issue as couched and the State's objection to the testimony is going to be sustained.

Because the State's objection was sustained, Dr. DiCataldo did not testify in the presence of the jury. Later, after the parties rested, the court ruled that the jury would not be instructed on the voluntary manslaughter theory, stating "failing to meet both the subjective standard and the objective standard, voluntary manslaughter is not going to be submitted."

Under Iowa Rule of Evidence 5.702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Here, Dr. DiCataldo's opinions would not help the jury. Initially, the expert testimony was to address Love's self-defense claim, but that was withdrawn. And

in his appellate brief, Love indicated the opinions were to support "obtaining an instruction for voluntary manslaughter."  To warrant a voluntary-manslaughter submission, the defendant must set forth enough evidence to support voluntary manslaughter's legal and factual test.  Love did not meet this standard, and the voluntary manslaughter instruction was not given.  Our appellate courts have described the factual requirements as:

> Voluntary manslaughter includes one subjective and two objective parts.  The subjective part is that the defendant must act solely as a result of sudden, violent, and irresistible passion.  The first objective part requires that the defendant's sudden, violent, and irresistible passion must result from serious provocation sufficient to excite such passion in a reasonable person.  The second objective part requires that there is not an interval between the provocation and the killing in which a person of ordinary reason and temperament would regain his or her control and suppress the impulse to kill.

*State v. Chavez*, No. 22-1280, 2023 WL 7014142, at *2 (Iowa Ct. App. Oct. 25, 2023) (cleaned up).

Love initially argued that Dr. DiCataldo's testimony would support both the subjective and objective components of a voluntary-manslaughter instruction, whether he acted reasonably based on his age and personal experiences.  Love turned to the subjective component after the court decided that Dr. DiCataldo's testimony could not support the objective component; Dr. DiCataldo's testimony on what a "reasonable 19-year-old" was explicitly against our caselaw prohibiting striation of "the reasonable person" based on age when the individual was deemed an adult.  *See Dorsey v. State*, 975 N.W.2d 356, 362 (Iowa 2022) (upholding the "categorical constitutional distinction . . . between juveniles and adults" at age eighteen and reiterating that "[c]onsiderations of efficiency and certainty require a bright line separating adults from juveniles" (citation omitted)).

And our appellate courts have declined to submit a voluntary manslaughter instruction to the jury when the objective test was not met. In *State v. Thompson*, the "[victim's] actions in slapping [the defendant] and insulting him with obscene gestures fell short of the objectively serious provocation required to submit a voluntary manslaughter instruction." 836 N.W.2d 470, 478 (Iowa 2013); *see also State v. Sauser*, No. 21-0759, 2022 WL 4361723, at *3 (Iowa Ct. App. Sept. 21, 2022) ("[Defendant] said that she sat next to [the victim] with the gun in her lap for 'fifteen, twenty, twenty-five minutes' before the shooting. While they were arguing, she texted a friend that she had been staying with: 'Ill be home Monday night if I can get out Lol got my gun loaded he better leave me alone Ill shoot.' These facts do not show defendant acted solely as a result of 'sudden, violent, and irresistible passion.'" (cleaned up)).

On our review, we find no evidence in the record indicates Love was adequately provoked and did not have a sufficient period in which "a person of ordinary reason and temperament would regain his or her control and suppress the impulse to kill." *Chavez*, 2023 WL 7014142, at *2. Provocation without a cooling-off period is a necessary component of a voluntary manslaughter instruction. Iowa Code § 707.4; *Thompson*, 836 N.W.2d at 477. Love failed to show both parts of the objective test.

Because Love did not provide an adequate factual basis to warrant a voluntary manslaughter instruction to the jury, any testimony from Dr. DiCataldo was improper and irrelevant. *See* Iowa R. Evid. 5.702. In the absence of additional argument as to how Dr. DiCataldo's testimony was relevant to the legal issues the jury was actually required to decide beyond those already raised and disposed of,

we find the court did not abuse its discretion in finding Dr. DiCataldo's testimony was irrelevant and subsequently excluding the expert from testifying.

## III. Conclusion.

Based upon the reasoning outlined above, we affirm Love's conviction.

**AFFIRMED.**